MILNE CHAIR CO. *v.* HAKE, COMMISSIONER, DEPT. OF
EMPLOYMENT SECURITY.

(*Nashville*, September Term, 1949.)

Opinion filed Feb. 10, 1950.

On rehearing June 9, 1950.

Miller, Martin, Hitchings & Tipton, of Chattanooga, for complainant.

Atchley & Atchley and W. T. Thrasher, Jr., of Chattanooga, for claimants.

W. L. Moore and Charles K. Cosner, both of Nashville, Sols. for W. O. Hake, Com'r.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

The Board of Review created by our Employment Security Act, Chapter 29, Acts of 1947, found that approximately 120 former employees of Milne Chair Company are entitled to payment of the unemployment benefits provided by this statute which is carried in Williams Supplement to the Code commencing at Section 6901.25. The Chancellor, in dismissing the certiorari petition of the Milne Chair Company, filed a brief memo wherein he stated that ''this Court does not feel that it could say that there is no evidence to support the findings of the Board of Review'', and then pointed out that he, therefore, felt compelled to dismiss the petition under Section 6 of the Act, C. S. Section 6901.30, subd. 1, wherein it is provided that: ''In any judicial proceeding under

this section, the findings of the board of review as to the facts, if there be·any evidence to support the same, shall be conclusive and the jurisdiction of said court shall be confined to questions of law."

The appeal of the Milne Chair Company from this decree presents for our determination the question of whether there was any substantial evidence before the Board of Review in support of its above stated finding. The facts before the board were either by stipulation or the evidence as to facts was not contradicted. Only those facts material to the decision of the question made will be stated.

On the morning of April 21, 1947 the Company for cause suspended for a week one employee who was a member of a labor union which had a contract with the Company for the union members working there. The union committee was promptly notified of this action. Shortly thereafter on that day 157 employees, all members of this union, left their jobs without notice in protest of this disciplinary action of the Company and formed a picket line around the plant.. That picket line was continously thereafter maintained through the time of the hearing by the Board of Review a number of months subsequent. All of the appellees here were among that 157 with the exception of possibly two or three who happened to be absent that day and who thereafter cooperated in one manner or another with those who walked out.

It was provided in the contract between the Union and the Company that if a "dispute of any kind arises, there shall be no suspension of work by the employees represented by this agreement on account of such dif-

ferences'' until an effort to settle the differences has been made by certain procedure set out in the agreement.

At a meeting on April 23 between representatives of the Company and the Union the Company rejected the Union's proposal ''that the workers be returned to their jobs and that the difficulty be arbitrated.'' The Company took the position at that meeting ''that the contract had been broken by the employees walking out and that it considered that they were no longer its employees''.

The next meeting between the Company and the Union was held on April 28. That was exactly one week from the date of the disciplinary action against the employee by suspending him for a week. At that meeting the Company rejected the proposal of the Union ''that both sides should forget everything that happened and put the people back to work'', the Company's position being that these people were no longer its employees. The picketing continued.

Two more entirely unsuccessful meetings, the last on May 20, were had between the Union and the Company. The Company remained firm in its position theretofore stated.

Commencing on May 26 the employees here involved, together with two more, filed in the re-employment security office claims for payment of unemployment benefits. Our State Commissioner of unemployment security, pursuant to the requirements of the statute, caused an investigation of the merits of the claims to be made, and in so doing took statements from these claimants. Practically all of them said in these statements that they had participated in the picketing, and would participate thereafter if requested. It is to be kept in mind that this picketing was being maintained continuously.

Section 5 of the Act, Code Section 6901.29, subd. E, provides that "an individual shall be disqualified for benefits" "for any week with respect to which the commissioner finds that his total or partial unemployment is due to a labor dispute which is in active progress at the factory, establishment, or other premises at which he is or was last employed," or if he belongs "to a grade or class of workers of which immediately before the commencement of the labor dispute, there were members employed at the premises at which the labor dispute occurs, any of whom are participating in the dispute".

The concerted activities of these employees in walking off the job and in picketing the plant in protest over the suspension of a fellow union member and in thus supporting him in connection with the treatment accorded him seems to be generally recognized as a labor dispute. See *Carter Carburetor Corporation* v. *National Labor Relations Board*, 8 Cir., 140 F. (2d) 714, 718 and cases there cited. Apparently, it is conceded in behalf of the persons here involved that the walkout and picketing was originally a labor dispute within the meaning of our Employment Security Act.

It is the insistence of the Milne Chair Company that these appellees are disqualified for the unemployment benefits claimed by that portion hereinabove quoted of Section 5 of the Act in that their unemployment was due to a labor dispute in active progress at the plant and in which they participated. That was also the conclusion of the Commissioner of Employment Security.

The Board of Review recognized the situation as a labor dispute in the beginning, but further held that: "These employees became involuntarily unemployed upon May 20, 1947 since the position taken by the company

in failing to further recognize them as employees amounted to their dismissal".

And made the further observation that: "Except for the position taken by the company, the claimants no doubt would be found to be participating in a labor dispute and, therefore, not entitled to any benefits whatever but the action of the company brought the labor dispute to an end."

Accordingly, the conclusion of the Board of Review was that the unemployment of these people was attributable to their dismissal by the company for breaking their contract rather than to a labor dispute. This Board, in reaching the conclusion just stated, said: "That the action of the company commencing first on April 23, 1947 and terminating May 20, 1947 amounted to an outright discharge of all of the employees involved and a total severance of the employer-employee relationship as of the latter date."

The above quoted excerpts from the opinion of the Board makes it manifest, we think, that the Board was of the opinion that a labor dispute could not exist in the absence of an employer-employee relationship. We cannot say, however, that this controlled the Board's decision. However, the relationship of employer-employee is not a prerequisite to the existence of a labor dispute in the application of our Employment Security Act. *Block Coal & Coke Co v. United Mine Workers,* 177 Tenn. 247, 148 S. W. (2d) 364, 149 S. W. (2d) 469.

While there are throughout our country a great many decisions by administrative boards as to various features of Employment Security Acts, this legislation intended as an aid in solving a generally existing economic problem is of comparatively recent origin in the United States. Perhaps this is why we have been unable to find much

precedent, one way or the other, on the question presented by the facts of this case.

However, the Oklahoma case of *Board of Review* v. *Mid-Continent Petroleum Corp.*, 193 Okl. 36, 141 P. (2d) 69, 70 is much in point. Important is the fact that there is a dissenting opinion in the case. Though the statute in that case was expressed differently from ours, the construction placed upon the language used gives it the same meaning with reference to the matter here under investigation as that conveyed by the language of our Act. In this Oklahoma case the claimant for unemployment benefits stated ''the reasons for his separation from his employment to be 'out on strike. Received letter dismissal.' '' There was a labor dispute, including a strike, in progress when this claimant was notified by the Company that he was discharged because he ''in connection with the strike, had committed criminal offenses of a designated character.'' He did not take advantage of the opportunity afforded him to disprove this charge. So the Court held this: ''The letter had nothing to do with his unemployment; that was, and continued to be, the result of the labor dispute in which Cox was engaged.''

A distinction between the Oklahoma case and the instant case is that in the Oklahoma case there was sort of a condition subsequent to the discharge of the claimant in that he was given the privilege of disproving the truth of the cause for which he was immediately dismissed. This seems to be, however, a distinction without a difference, because the man had been discharged.

The disagreement between the members of the Oklahoma Court of last resort seems to establish it as a fact that reasonable men may and do sincerely disagree as to whether a labor dispute is the cause of the

unemployment of the laborer under facts practically equivalent to those presented by this record. That being the situation, we cannot say that the decision of the Board of Review is not supported by substantial evidence. The fact that some or all of the members of this Court might have reached a fact conclusion contrary to that reached by the Board of Review, had we been members of that Board, is immaterial, it being a situation as to which men may reasonably reach the conclusion reached by the Board. The language of our statute by which we are controlled is: ''The findings of the board of review as to the facts, if there be any evidence to support the same, shall be conclusive and the jurisdiction of said court shall be confined to questions of law.''

A clear limitation of our authority under this statutory prohibition just mentioned is this statement of the Supreme Court of the United States: ''The question presented 'is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially.' To sustain the commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The 'reviewing court's function is limited'. All that is needed to support the commission's interpretation is that it has 'warrant in the record' and a 'reasonable basis in law'.'' *Unemployment Compensation Commission of Territory of Alaska* v. *Aragan*, 329 U. S. 143, 67 S. Ct. 245, 250, 91 L. Ed. 136, 145.

This Court, therefore, concludes that there is in this record substantial evidence in support of the Board's finding that the unemployment of these appellees was due to their dismissal rather than to a labor dispute.

█ From the employer's viewpoint, it is a fact that these appellees were guilty of misconduct which justified their dismissal. However, Section 5, subd. B (1) and (2) of the Employment Security Act, C. S. Section 6901.29, subd. B (1, 2), makes it very clear that the legislature intended that workers unemployed by reason of misconduct in connection with their obligations to their employer should not, merely because of such misconduct, be disqualified from receiving unemployment benefit payments. The language of this section is that "If the commissioner finds that he has been discharged or removed from his work for gross misconduct in connection with his work" he shall be disqualified for benefits for not less than one nor more than nine weeks according to the seriousness of the misconduct. The reason for this indulgence to those unemployed by reason of misconduct is stated in the first section of the Act. C. S. Section 6901.25. It is that such unemployment so often "falls with crushing force upon the unemployed worker and his family." The wisdom of this policy is not a judicial matter. If experience in the administration of this comparatively new legislation proves such policy to be unwise the Legislature alone may alter that policy. Courts cannot.

It is next insisted by Milne Chair Company that all the evidence is to the effect that these people were not available for work, hence disqualified under the statute from payment of unemployment benefits. The insistence just stated is anchored upon the fact that in the statement which these appellees gave in support of their claims for unemployment compensation they said that they would thereafter picket the company's plant, if requested.

██ The conclusion to be reached from what is contained in some of these statements is that the time allotted to each one for picket service was one hour. It does not appear that such service is daily. It hardly could be with that many people to carry on the picketing. In this situation, we would not be justified in holding, contrary to the findings of the Board, that the short time consumed in picketing makes these people unavailable for employment. The contrary would seem to be the truth. Nor can we assume that any of these employees would either be requested to picket or would continue to serve on the picket line if it interfered with any employment made available.

For the reason stated, we must hold that the Chancellor did not err in sustaining the decision of the Board of Review. However, we are of the opinion that under the facts of this case the employer, Milne Chair Company, shall not be charged "with any such benefits for experience rating purposes." Code Section 6901.29, subd A. The decree of the Chancellor will be modified so as to expressly so provide. As thus modified, that decree is affirmed with costs to be adjudged against the appellant, Milne Chair Company.

## On Petition to Rehear.

The claimants, the employer and the commissioner, being all the parties to this suit, have filed a joint petition to rehear. By an inadvertence this petition was not called to the attention of the Court until recently, though the petition was filed within the proper time.

In the last paragraph of the opinion there appears this statement: "However, we are of the opinion that under the facts of this case the employer, Milne Chair Company, shall not be charged 'with any such benefits

for experience rating purposes.' Code Section 6901.29 A. The decree of the Chancellor will be modified so as to expressly so provide.''

 The petition to rehear makes this point: ''Section 6901.29 A, cited in the final paragraph of the opinion as the basis for the non-charge of the employer's account with the benefits ordered paid, deals with a situation where an employee voluntarily quits work, and joint petitioners respectfully suggest that this provision of the Tennessee Employment Security Act is inconsistent with this Court's finding that claimants were dismissed by the employer.''

The point so made by the petition to rehear is well taken, and is sustained.

The prayer of the joint petition to rehear is: ''That this Court amend its opinion filed in this case February 10, 1950 and find claimants guilty of misconduct, other than gross, under the provisions of Section 6901.29 B (2) of the Tennessee Act and impose upon them a disqualification period of at least one week; and that the employer not be charged with any benefits for its experience rating purposes under Section 6901.29 B (2).''

This prayer of the petition to rehear is well taken, and is granted. The opinion of this Court is accordingly so amended. The disqualification period is fixed at four weeks.

All concur.