MONSANTO CHEMICAL CO. *v.* COMMR. OF LABOR.

5-1575                                    314 S. W. 2d 493

Opinion delivered July 1, 1958.

*Davis & Ragsdale,* for appellant.

*McMath, Leatherman & Woods,* for appellee.

GEORGE ROSE SMITH, J. The question in this case is whether 232 employees of the appellant were entitled to receive unemployment compensation during the latter part of a strike, after the appellant, by using supervisory employees, had resumed production at its plant. The Board of Review, whose decision was affirmed by the circuit court, held that the applicants were eligible for benefits. By this appeal Monsanto asks us to re-

verse that decision and to direct that the payment of these benefits not be charged to its account. See *Call* v. *Luten,* 219 Ark. 640, 244 S. W. 2d 130.

Several weeks after the expiration of the contract between Monsanto and the union representing its employees, negotiations for a new contract failed, and the union called an economic strike, effective March 2, 1956. Picket lines were established, and the plant was idle until April 27. The appellees do not seek unemployment compensation for the period while the plant was not in operation. On April 27 Monsanto, by utilizing the services of 91 supervisory employees, was able to resume at least partial production. Beds were moved into the plant, which was operated twenty-four hours a day. On and after May 19 applications for benefits were filed by 232 of the 339 striking employees. The claims involve a three-week period ending June 8, when the labor dispute was settled and the workers returned to their jobs.

The first question is one of law and centers upon the interpretation of this language in the statute: ''An individual shall not be eligible for benefits for any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, e s t a b l i s h m e n t, or other premises at which he is or was last employed [with two provisos that are unimportant here].'' Ark. Stats. 1947, § 81-1105 (f).

The issue turns upon what is meant by the phrase, ''a stoppage of work.'' These words appear in the unemployment acts of many other states and have been frequently construed. It could be argued that the language refers to a cessation of work on the part of the employee, in which case the phrase would be synonymous with unemployment. That construction was in fact adopted in Oklahoma, but there the rule was later changed by an amendment to the statute.

Elsewhere it has been pointed out that the Oklahoma view makes the reference to a stoppage of work

meaningless, for the statutory sentence has already mentioned unemployment and presupposes the existence of that condition. See Williams, "The Labor Dispute Disqualification," 8 Vanderbilt L. Rev. 338; *Sakrison* v. *Pierce,* 66 Ariz. 162, 185 P. 2d 528. Consequently the view is now generally accepted that the stoppage of work means a cessation of business activity at the employer's establishment rather than unemployment on the part of the applicant for benefits. The authorities were reviewed in *Abbott Pub. Co.* v. *Annunzio,* 414 Ill. 559, 112 N. E. 2d 101, where the court observed that the majority interpretation is followed in nineteen states, while the minority rule has been applied administratively in Colorado and judicially in Oklahoma.

We have no hesitancy in assigning to our statute the meaning that has been almost unanimously given to its language in other jurisdictions. Not only does the majority rule adhere to the basic principle that every word in a statute must be given effect if possible; it also recognizes and carries out the legislative policy of avoiding favoritism toward either side in a labor dispute. As the court stated in *Saunders* v. *Maryland Unemployment Comp. Bd.,* 188 Md. 677, 53 A. 2d 579.: "The purpose of the statute was to alleviate the consequences of involuntary unemployment. It was not intended to penalize or subsidize either employees or employers, lawfully engaged in a labor dispute. It was not intended to compel striking workmen to remain without its benefits longer than their own action made necessary. Nor was it intended to compel employers to finance their employees in a strike against them. It was not concerned at all with labor disputes, except in so far as it became necessary to consider them in deciding when unemployment was voluntary and when it was involuntary. And it stated how they should be considered with reference to unemployment in plain, simple and easily understood words."

The next question is whether the stoppage of work at the Monsanto plant had ended when the present claims were filed, on and after May 19. This is an issue

of fact, upon which we must affirm the Board of Review's findings if supported by substantial evidence. *Terry Dairy Products Co.* v. *Cash*, 224 Ark. 576, 275 S. W. 2d 12. We are unable to say that the record is devoid of such evidence.

There is really not a great deal of conflict in the proof concerning this issue. February was the last month of normal operations before the strike. In that month, according to the report filed by Monsanto with the Oil and Gas Commission, the company produced 1,-150,320 barrels of its various petroleum products. The appellant's witness Carney testified that in February "we had some stills shut down, which is normal."

In May, while the supervisory employees were operating the plant day and night, the reported production was 1,082,769 barrels, and in June (the strike ended June 8) Monsanto reported an output of 1,237,592 barrels. It is shown without dispute that during the three-week period now in question the company did not operate one of its catalytic cracking stills and did not operate its alkylation plant. We infer that this prevented the company from processing some of its products to the point of complete readiness for the market, but much of the testimony is so technical that we cannot say with assurance how serious these matters really were. As Monsanto's counsel candidly remarked to one of the witnesses: "You talk so much chemistry I'm afraid that none of us can completely understand it."

The appellant insists that the stoppage of work must be held to have continued until the plant's production was again entirely normal in every respect. If this view were accepted Monsanto would be right in contending that the Board's findings are not sustained by the evidence. We are of the opinion, however, that the stoppage ends when the employer regains production to a point at which his business operations are substantially normal. As Professor Williams observes in the article cited above, it is illogical to say that the stoppage does not occur in the first place until production has fallen off by at least 20 or 30 per cent and yet to hold that

the stoppage continues until the plant again reaches 100 per cent of its productive capacity. Williams concludes that "The administrators and the court will be looking for a 'substantial curtailment' of production and a return to substantially 'normal production.' More definiteness can hardly be expected in anything so obviously purely a question of degree." See also *Ablondi* v. *Board of Review,* 8 N. J. Super. 71, 73 A. 2d 262, and Note, 12 Ark. L. Rev. 123. It is of course apparent that if a resumption of completely normal operations were required, the employer could continue the stoppage indefinitely by leaving a small department of his plant idle.

Here the proof shows that, in terms of barrels, Monsanto's output in May and June was roughly the equivalent of normal production. That some of the stills were not operating does not show conclusively that the stoppage continued to exist, in view of the admission that it was normal for some stills to be shut down. On the record as a whole we do not feel justified in holding that the Board's findings are unsupported by any substantial evidence.

Finally, Monsanto contends that the striking employees were not available for other work. The proof is that the 339 employees maintained a picket line consisting of 21 men at a time; this duty appears to have been rotated. The appellant, citing *Producers Produce Co.* v. *Industrial Comm.,* 365 Mo. 996, 291 S. W. 2d 166, contends in substance that as a matter of law a workman cannot at the same time be available for other work and be engaged in a strike which has as its ultimate purpose a resumption of the worker's former employment. That is indeed the view expressed by the Missouri court. The contrary position was taken in *Milne Chair Co.* v. *Hake,* 190 Tenn. 395, 230 S. W. 2d 393, and, at least inferentially, in several of the cases holding that striking employees are entitled to benefits when there is no longer a stoppage of work at the employer's place of business.

It seems to us that the issue is essentially one of fact. Here only 232 of the 339 employees applied for unemployment compensation. The proof shows that most of the others found work elsewhere, which must have been temporary, as the record indicates that all the employees returned to work at Monsanto after the dispute was settled. The present applicants registered for work at the local office of the employment service and are not shown to have been disqualified by that office on the basis of unavailability. This showing made a *prima facie* case and shifted to Monsanto the burden of going forward with the evidence. *Little Rock Furn. Mfg. Co.* v. *Commr. of Labor,* 227 Ark. 288, 298 S. W. 2d 56. Monsanto made no effort to develop proof with respect to any particular applicant; it relies instead upon the appellees' admission that the various striking employees were available for picket duty.

We do not think that the Board was required to find that the applicants would have refused offers of work in order to be on hand for occasional tours of duty on the picket line. There is no evidence to support that conclusion, which does not impress us as a reasonable one. The Board may well have inferred that some of the 107 employees who did not apply for benefits had participated for a time in the picketing before accepting new jobs. The Board may also have believed that these applicants registered at the employment office in the hope of finding work for the support of themselves and their families. It cannot be said that the undisputed evidence shows that the appellees were not available for other employment.

Affirmed.

McFADDIN, J., not participating.