## GONZALES *v.* UNITED STATES.

No. 416.   Argued May 2, 1960.—Decided June 27, 1960.

*Hayden C. Covington* argued the cause and filed a brief for petitioner.

*Daniel M. Friedman* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *J. F. Bishop.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a prosecution for refusal to be inducted into the armed services, in violation of the provisions of the Universal Military Training and Service Act, 62 Stat. 604, 622, 50 U. S. C. App. § 462 (a). Petitioner, who claims to be a conscientious objector, contends that he was denied due process, both in the proceedings before a hearing officer of the Department of Justice and at trial. He says that he was not permitted to rebut before the hearing officer statements attributed to him by the local board, and, further, that he was denied at trial the right to have the Department of Justice hearing officer's report and the original report of the Federal Bureau of Investigation as to his claim—all in violation of the Fifth Amendment. The trial judge decided that the administrative procedures of the Act were fully complied with and refused to require the production of such documents. Petitioner was found guilty and sentenced to 15 months' imprisonment. The Court of Appeals affirmed. 269 F. 2d 613. We granted certiorari in view of the importance of the questions in the administration of the Act. 361 U. S. 899. We have concluded that petitioner's claims are controlled by the rationale of *Gonzales* v. *United States,* 348 U. S. 407 (1955), and *United States* v. *Nugent,* 346 U. S. 1 (1953), and therefore affirm the judgment.

Petitioner registered with Local Board No. 9, Boulder, Colorado, on March 17, 1952. His answers to the classification questionnaire reflected that he was a minister of Jehovah's Witnesses, employed at night by a sugar producer. He claimed IV–D classification as a minister of religion, devoting a minimum of 100 hours a month to

preaching. On November 13, 1952, he was classified in Class I–A. On November 22, 1952, he wrote the Board, protesting this classification. He again stated that he was "a regular minister"; that he was "devoting an average of 100 hours a month to actual preaching publicly," in addition to 50 to 75 hours in other ministerial duties, and that he opposed war in any form. Thereafter he was classified I–O. On April 1, 1953, after some six months of full-time "pioneering," petitioner discontinued devoting 100 hours a month to preaching, but failed to so notify his local board. In a periodic review, the local board on July 30, 1953, reclassified him I–A and upheld this classification after a personal appearance by petitioner, because of his willingness to kill in defense of his church and home. Upon administrative approval of the reclassification, he was ordered to report for induction on June 11, 1956, but failed to do so. He was not prosecuted, however, and his case was subsequently reopened, in the light of *Sicurella* v. *United States,* 348 U. S. 385 (1955). He was again reclassified I–A by the local board. There followed a customary Department of Justice hearing, at which petitioner appeared. In his report to the Attorney General, the hearing officer suggested that the petitioner be exempt only from combatant training and service. On March 21, 1957, however, the Department recommended approval of the I–A classification. Its ground for this recommendation was that, while petitioner claimed before the local board on August 17, 1956 (as evidenced by its memorandum in his file of that date), that he was devoting 100 hours per month to actual preaching, the headquarters of the Jehovah's Witnesses reported that he was no longer doing so and, on the contrary, had relinquished both his Pioneer and Bible Student Servant positions. It reported that he now devoted only some 6½ hours per month to public preaching and from 20 to 25 hours per month to church activities. His claim was therefore "so

62

highly exaggerated," the Department concluded, that it "cast doubt upon his veracity and, consequently, upon his sincerity and good faith." The appeal board furnished petitioner a copy of the recommendation. In his answer thereto, he advised the Board that he had made no such statement in 1956, and asserted that his only claim to "pioneering" was in 1952. The appeal board, however, unanimously concurred in the Department's recommendation. Upon return of the file to the local board, petitioner was again ordered to report for induction and this prosecution followed his failure to do so.

Petitioner first contends that the Department denied him procedural due process by not giving him timely opportunity, before its final recommendation to the appeal board, to answer the statement of the local board as to his claim of devoting 100 hours to actual preaching. But the statement of the local board attributing this claim to petitioner was in his file. He admitted that he knew it was open to him at all times, and he could have rebutted it before the hearing officer. This he failed to do, asserting that he did not know it to be in his file. Apparently he never took the trouble to find out. Nevertheless he had ample opportunity to contest the statement before the appeal board. After the recommendation of the Department is forwarded to the appeal board, that is the appropriate place for a registrant to lodge his denial. This he did. We found in *Gonzales* v. *United States, supra*, that this was the controlling reason why copies of the recommendation should be furnished a registrant. We said there that it was necessary "that a registrant be given an opportunity to rebut [the Department's] recommendation when it comes to the Appeal Board, the agency with the ultimate responsibility for classification." 348 U. S., at 412. We fail to see how such procedure resulted in any prejudice to petitioner's contention, which was considered by the appeal board and denied by it. As was

said in *Gonzales,* "it is the Appeal Board which renders the selective service determination considered 'final' in the courts, not to be overturned unless there is no basis in fact. *Estep* v. *United States,* 327 U. S. 114." 348 U. S., at 412–413.

But there are other contentions which might be considered more difficult. At his trial, petitioner sought to secure through subpoena *duces tecum* the longhand notes of the Department's hearing officer, Evensen, as well as his report thereon. Petitioner also claimed at trial the right to inspect the original Federal Bureau of Investigation reports to the Department of Justice. He alleged no specific procedural errors or evidence withheld; nor did he elaborate just what favorable evidence the Federal Bureau of Investigation reports might disclose.

Section 6 (j) of the Act, as we have held, does require the Department's recommendation to be placed in a registrant's file. *Gonzales* v. *United States, supra.* But there is nothing in the Act requiring the hearing officer's report to be likewise turned over to the registrant. While the regulations formerly required that the hearing officer's report be placed in the registrant's file, this requirement was eliminated in 1952. Moreover, the hearing officer's report is but intradepartmental, is directed to the Attorney General and, of course, is not the recommendation of the Department. It is not essentially different from a memorandum of an attorney in the Department of Justice, of which the Attorney General receives many, and to which he may give his approval or rejection. It is but part of the whole process within the Department that goes into the making of the final recommendation to the appeal board.

It is also significant that neither this report nor the hearing officer's notes were furnished to the appeal board. Hence the petitioner had full opportunity to traverse the only conclusions of the Department on file with

the Board. Petitioner knew that the Department's recommendation was based not on the hearing officer's report but on the statement of the local board in his file. Having had every opportunity to rebut the finding of the local board before both the hearing officer and the appeal board, petitioner cannot now claim that he was denied due process because he did not succeed.[1]

It appears to us that the same reasoning applies to the production of the hearing officer's report and notes at the trial. In addition, petitioner has failed to show any particular need for the report and notes. While there are now allegations of the withholding of "favorable evidence developed at the hearing" and a denial of a "full and fair hearing," no such claim was made by petitioner at any stage of the administrative process. Moreover, his testimony at trial never developed any such facts. In the light of these circumstances, as well as the fact that the issue at trial in this respect centered entirely on the Department's recommendation, which petitioner repudiated but which both the appeal board and the courts below found supported by the record, we find no relevancy in the hearing officer's report and notes.

Finally petitioner says that he was entitled to inspect the FBI report during the proceedings before the hearing officer as well as at the trial. He did receive a résumé of it—the same that was furnished the appeal board—and he made no claim of its inaccuracy. Even now no such

---

[1] Petitioner points out that the regulations, as we have said, at one time required copies of the hearing officer's report to be placed in the registrant's file. He attributes congressional approval thereto because the selective service laws were re-enacted and amended in 1951 and 1952. The same reasoning would apply, however, to the repeal of the regulation. As we noted, it was stricken by the Attorney General in 1952 and Congress has amended the Act three times subsequently—in 1955, 1957, and 1958. Still it has failed to indicate any objection to the repeal of the regulation.

claim is asserted. He bases his present contention on the general right to explore, indicating that he hopes to find some discrepancy in the résumé. But this is fully answered by *United States* v. *Nugent, supra.* There we held "that the statutory scheme for review, within the selective service system, . . . entitles [conscientious objectors] to no guarantee that the FBI reports must be produced for their inspection." 346 U. S., at 5–6. Even if we were not bound by *Nugent,* petitioner here would not be entitled to the report. The recommendation of the Department—as well as the decision of the appeal board—was based entirely on the local board file, not on an FBI report.

As to the production of the report at the trial, it is true that, while that issue was raised in *Nugent,*[2] the Court gave it no separate treatment. However, it would be an act of folly not to require the production of such reports before the appeal boards, whose "actions are final" and to be overturned "only if there is no basis in fact for the classification," *Estep* v. *United States,* 327 U. S. 114, 122 (1946), and subsequently to require their production at the trials in the District Courts. We note that the Courts of Appeals have uniformly rejected such claims. This is not to say that there might not be circumstances in a particular case where fairness in the proceeding would require production. No such circumstances, as foundation for a claim of actual unfairness, are before us. Contrariwise, the résumé fully set out petitioner's statement before the local board as to his ministerial activity. Since this is not disputed, and since the Department's recommendation was based on a disparity between petitioner's representations before the local

[2] Joint Brief for Respondents, p. 181, *United States* v. *Nugent,* 346 U. S. 1 (1953).

board—not on the FBI report—it follows that the reasoning of *Nugent* controls.

Petitioner raises other points, such as the fact that the prosecutor did not call the members and clerk of the local board to testify at his trial. We find no substance in any of them. Petitioner could have subpoenaed any witnesses he wished at the trial. It was he who was challenging the classification. The Government relied only on the record in the file, all of which was available to petitioner. He makes much of the identity of the language of the statement he is found to have made before the local board on August 17, 1956, as to his ministerial activity, and his earlier letter to the Board in 1952. But all of this was before the appeal board. Moreover, he could have called witnesses to bring out the circumstances surrounding the statement and the letter; the FBI files would have been to no avail. He contented himself, however, with offering only his own denial. The appeal board resolved this issue against him. It found that his claim as to ministerial activity was exaggerated and cast doubt on his sincerity. Both courts below have found "that the record is not without evidence to support these conclusions." We will not set aside their findings here.

*Affirmed.*

Mr. Chief Justice Warren, with whom Mr. Justice Black, Mr. Justice Douglas, and Mr. Justice Brennan join, dissenting.

I cannot agree with the decision of the Court, for I believe that petitioner has been deprived of a right which is his by statute and regulation—the right to a full hearing. The facts of this case not only indicate a miscarriage of justice, but also underline the significance of the hearing rights which petitioner was never accorded.

Petitioner, a youth of 18 at the time, first claimed exemption as a minister of Jehovah's Witnesses in 1952,

describing the extent and nature of his religious activities in a detailed letter to the local selective service board. The board, however, classified him 1-A, and, after an unsuccessful appeal, he was ordered to report for induction. Although he refused to comply with the order, his case was reopened after our decision in *Sicurella* v. *United States,* 348 U. S. 385.[1] He renewed his claim for exemption, asserting that he was a minister and a conscientious objector, but again the local board ruled adversely. On appeal, the case was referred to the Department of Justice, and petitioner appeared before a hearing officer.

The hearing officer's report, as summarized by the Department of Justice, was as follows:

> "The Hearing Officer reported that registrant gave the appearance of being sincere and firm in his beliefs and that he appeared to be well versed in the scriptures. He found that registrant's objections are based upon his religious training and beliefs but concluded that he is not opposed to participation in war in any form. He further concluded that registrant was opposed to combatant training and service but not opposed to noncombatant training and service. He, therefore, recommended that registrant be exempt from combatant training and service only."

This was hardly an astonishing recommendation, inasmuch as the summaries of two F. B. I. investigative reports were entirely—and in my judgment conclusively—favorable. At the time of the first report in 1954, petitioner's grade-school teachers related that he had been "very cooperative [and] mannerly," and that he had

---

[1] In *Sicurella,* which involved a member of Jehovah's Witnesses, we held that the petitioner's willingness to fight in defense of his "ministry, Kingdom Interests, and . . . his fellow brethren" was not, under the circumstances, a sufficient basis upon which to deny him exemption as a conscientious objector.

"refused to salute the flag on religious grounds." His former employers "found him an excellent worker, very serious about his religion and sincere and fair in his dealings." His neighbors stated that he was "a quiet and orderly young man whose character and reputation are good," that he was a "very active" member of Jehovah's Witnesses, and that they considered him to be "sincere in his beliefs." Petitioner's references and his fellow members in the sect said that he was "a very active, sincere member," and that they believed he was "in good faith in his conscientious-objector claim." The second report, dated 1956, incorporated the first and added the following: Petitioner's employer regarded him as "an excellent worker, completely reliable, dependable and of excellent morals, character and associates." His acquaintances, neighbors and religious associates "all spoke favorably concerning [his] character and reputation, conduct and morals," and reported that he was "very active in . . . church affairs . . . and . . . very devoted to his religious beliefs." They stated that he "lives up to the teachings of the church and is considered to be sincere in his religious beliefs and in his conscientious-objector claim." The hearing officer was understandably impressed.

However, the Chief of the Conscientious-Objector Section of the Justice Department, who reviewed the file, took a contrary view. He fastened upon a single item in the file—a matter which had neither been mentioned by the hearing officer nor, for all that appears, relied upon by the local board—and recommended to petitioner's appeal board that the claim not be sustained. The item in question was the local board's summary of petitioner's appearance before it in 1956, which the section chief interpreted to state that petitioner at that time had claimed he was still devoting 100 hours a month to preaching, as his 1952

letter to the board had stated.[2]   Since the investigative reports indicated that petitioner's status as a Jehovah's Witness "Pioneer" had terminated in 1953, and that from 1954 to 1956 he had devoted only six and one-half hours

---

[2] The local board memorandum reads in full as follows:

"When asked by the members of Local Board No. 9, Boulder, Colorado, if he thought he was entitled to any other classification than that of I–A, Mr. Gonzales replied, 'I am a minister and as such should be classified 4–D.   Also, a minister is automatically classified as a conscientious objector.'   The board replied that this statement was in error.

"Mr. Gonzales then went on to say that he had always made the claim that he was a minister even at the very beginning of his registration.   He still made the statement that if I am a minister I am a conscientious objector.

"When asked if he would participate in the conscientious objector work program, he stated definitely not.

"Mr. Gonzales stated '*I am a regular minister as defined under section 16 G part II of the laws and regulations set out by Selective Service Act of 1948.   At present I am devoting an average of 100 hours a month to actual preaching publicly and from house to house, and an additional 50–75 hours in preparation for ministerial duties such as; preparation for home bible studies; calling back on good-will persons; attending congregational meetings, as well as training students to become ministers.   I also serve as Stock Servant for the local congregation.   As you perhaps already know that the Selective Service National Headquarters has determined that Jehovah's Witnesses and the Watchtower Bible and Tract Society constitutes a recognized religious organization and that all Jehovah's Witnesses who are regularly and customarily teaching and preaching the doctrines and principles of the Bible as advocated by Jehovah's Witnesses as a vocation and not incidentally are entitled to exemption as ministers of religion.   These are some of the reasons I request a 4–D classification, so I would like for you to further consider my case as a minister of the gospel or would like to appear in person before the local board members for further consideration or discussion in regard to my case.*'

"When asked by the board if he had any further information to submit, he stated he submitted no new evidence except what was

a month to preaching, the section chief concluded that petitioner's "claim as to the amount of his religious activities is so highly exaggerated . . . as to cast doubt upon his veracity and, consequently, upon his sincerity and good faith."

Petitioner was informed of this recommendation, and wrote to the appeal board as follows:

> ". . . I would like to state that I *did not* at such a time [in 1956] make such a statement or any statement implicating the same. The only time I submitted such information was when I was pioneering that was in the period of October 1, 1952 to April 16, 1953. . . . I would like to make it plain that I in no manner ever exaggerated my report concerning my activities. The reason being more than just my respect for mere man, but as a Christian and Bible Student I realize I stand before the Higher Authorities Jehovah God and Jesus Christ, I am also fully aware of the consequences to liars as stated at Proverbs 6:16, 17, 19 showing God hates a lying tongue. I also realize that for one to lie would make void his Christian conduct and worship. So please consider the information here submitted, I am sure the record stands behind it all."

This statement, set against the background of the information of record regarding petitioner's character, has the ring of truth. Moreover, it is corroborated by the inherent improbability that petitioner's oral statement in 1956 would have been a word-for-word and sentence-for-sentence carbon copy of the written statement he had sub-

---

stated above, but would like to submit a certificate of marriage as the only new matter to be brought before the board."

The italicized portion repeats the statement petitioner made in his 1952 letter to the local board. The significance of this repetition is discussed *infra.*

mitted four years before, down to the request for a personal appearance which he was at that very minute receiving.[3]   And it should be emphasized that the only evidence that petitioner made such a statement was the board memorandum, set forth in note 2, *supra*.  The most likely explanation is that the local board merely intended to say that petitioner had repeated his basic claim to exemption, and that the board utilized petitioner's prior letter on the assumption that it described that claim. But, so far as appears, no one in the Department took the trouble to ask the local board precisely what its memorandum meant.

Although the Department's recommendation was based upon this dubious foundation, the appeal board followed that recommendation.   Before the date scheduled for petitioner's induction, he informed the local board that his wife was pregnant, but the board told him that the notification came too late.   Petitioner refused to be inducted, was prosecuted, and was convicted.

The striking thing about this case—aside from the dishonoring of petitioner's claim—is that he never once received a real opportunity to persuade any Department or selective service officer face to face that he had not lied to the local board, for the accusation was never made until petitioner's opportunity for oral response had passed.   The hearing officer never adverted to the matter, and the Department's recommendation was made on grounds entirely different from the matters which had been explored at the hearing.   It is true, as I have indicated, that petitioner was allowed to file a rebuttal before the appeal board; but that rebuttal was *written*, not oral. See 32 CFR § 1626.25 (e).   Since the issue was one of credibility, it can hardly be maintained that this afforded

---

[3] See the italicized portion of the board's memorandum, note 2, *supra*.

petitioner a fair opportunity to meet an accusation determinative of his case.

Nor can it be said that the Department's recommendation, and the basis therefor, has no significance. On the contrary, the statute makes the Department proceeding an integral and important part of the classification process; for every appeal must be referred to the Department, and, although the appeal board is not bound to follow the Department's recommendation, it is admonished by the statute to "give consideration to" it.[4] The fact appears to be that these recommendations are followed in over 90% of the cases.[5] Moreover, the selective service classification which is given administratively cannot effectively be contested in a criminal proceeding in court, in view of the extremely restricted judicial review of that classification. See *Witmer* v. *United States,* 348 U. S. 375. These factors reveal the critical importance of the Department's recommendation, and, in turn, of the inadequate procedures under which petitioner was permitted to present his claim to the Department.

Congress fully recognized the significance of the Department of Justice stage of the proceeding, for it directed that every appeal be referred to the Department "for inquiry and hearing," and commanded the Department, "after appropriate inquiry," to "hold a hearing with respect to the character and good faith of the objections of the person concerned." An adverse recommendation is to be made only when "after such hearing the Department of Justice finds that his objections are not sustained."[6] The regulations are in accord. 32 CFR § 1626.25.

---

[4] 62 Stat. 613, as amended, 50 U. S. C. App. § 456 (j).

[5] See Smith and Bell, "The Conscientious-Objector Program—A Search for Sincerity," 19 U. Pitt. L. Rev. 695, 702.

[6] Note 4, *supra.*

In requiring a hearing, Congress did not mean, in my opinion, that a guessing contest would suffice. It is true enough that, prior to the hearing, petitioner could have searched the files and discovered the local board memorandum; but this opportunity hardly measures up to the traditional concept of a hearing as involving notice of charges. And I think it not amiss, in considering this matter, to note that at the time of his appearance before the local board and the hearing officer, petitioner, a laborer with but an eighth-grade education, was a youth of 22 years of age and was unrepresented by counsel. I doubt that anyone would maintain that there would be a hearing in any true sense of the word if such a person were told by the Department that he could appear and say whatever he wished, but that the Department would not indicate to him what it considered pertinent—indeed, what it considered conclusive unless rebutted. Yet in substance this is exactly what happened here. I cannot believe that this procedure comports with Congress' intent.

Nor can I reconcile the Court's decision with precedent. In *Morgan* v. *United States,* 304 U. S. 1, the Court held a government rate order void because the stockyards commission men who were affected by it were not given the "full hearing" required by the pertinent statute. There was no question of these individuals not being allowed to argue their case. In fact, there had been a full and lengthy proceeding for the introduction of evidence, and in addition the parties had been granted an oral argument before the Acting Secretary of Agriculture. But this Court nonetheless found that there had not been a hearing within the meaning of the statute, and phrased its holding in language which is uniquely apropos here:

> "The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet

them. The right to submit argument implies that opportunity; otherwise the right might be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command." *Id.,* at 18–19.

I do not believe that the claim of Raymond Gonzales to a full hearing is less worthy of consideration than the rights of the stockyards commission men in *Morgan.*

In sum, I am unwilling to attribute to Congress any intent other than one which would guarantee to persons like petitioner every procedural safeguard which appears reasonably designed to insure a fair determination of their claims. We must remember that we are dealing here with a system of universal military service which touches, directly or indirectly, practically every person and every family in this country. When the people are thus brought into contact with the Government, the importance to the commonweal of insuring their confidence in the justness of the program cannot be overemphasized, for to them it is not merely the fairness of a program which is involved, but the fairness of their Government. The sensitivity of Congress to this need is nowhere better demonstrated than in the statutory provisions concerning the treatment of persons claiming exemption as conscientious objectors. As Congress has recognized, one of the most fundamental aspects of our national ethic is a recognition of the worth of the person, acting according to the dictates of his own conscience. And thus it is that, even in formulating legislation deemed to be of prime importance to the very existence of the Nation, Congress refrained from impressing into military service those who by religious conviction find war an affront to God and morality. The

desire of Congress that such beliefs be respected is further reflected by its unwillingness to entrust to a local board the final authority to pass upon the claims of conscientious objectors. Instead, Congress provided for an appeal within the selective service system, together with a hearing in the Department of Justice. In determining what Congress intended by these statutory provisions, we must not forget the nature of the program with which we are dealing, nor must we forget that most of the subjects of governmental action in these cases are inexperienced youths, many only 18 years of age, often unrepresented by attorneys. I am unwilling to give to a statute conceived in such a context a construction which results in a young man of unblemished reputation, who claims religious scruples, being sent to prison for 15 months without having received a full and fair consideration of his case. I say this with assurance that Congress did not intend that these humanitarian benefits of the Act be accorded grudgingly.

I dissent.