CONTINENTAL OIL CO., A CORPORATION, PLAINTIFF AND APPEL-
LANT, *v.* BOARD OF LABOR APPEALS ET AL., DEFENDANTS AND
RESPONDENTS.

No. 13967.
Submitted June 6, 1978.
Decided Aug. 9, 1978.
582 P.2d 1236.

Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Gerald F. Krieg argued, Billings, for plaintiff and appellant.

Moody Brickett argued, Helena, McKittrick & Duffy, Great Falls (Joseph W. Duffy argued), Great Falls, for defendants and respondents.

MR. JUSTICE DALY delivered the opinion of the Court.

This is an appeal from the judgment of the District Court, Yellowstone County, affirming an order of the Board of Labor Appeals awarding unemployment compensation to striking employees of the Continental Oil Refinery at Billings, Montana.

There is little dispute in the facts concerning these compensation claims. In January 1975, negotiations broke down between the Continental Oil Company (appellant) and Local No. 2-470 of the Oil, Chemical & Atomic Workers International Union for a new contract covering production and maintenance employees at the Conoco Refinery in Billings. On January 18, 1975 the Union called

a strike which commenced at about 8:00 p. m. that day. Before the strike approximately 90 employees, including trainees, worked in production operations and approximately 43 employees normally worked in plant maintenance.

Appellant imported approximately 65 supervisors and engineers to replace the personnel on strike. Throughout the strike these employees conducted all operations normally conducted by the employees represented by the Union although certain nonproduction activities at the refinery, such as training, engineering and budget planning, and capital improvement, were not performed during the strike. It was the finding of both the appeals referee and the Board of Labor Appeals that these functions were not production or operation functions of the employer's business.

Appellant's records show that during the time the strike was in progress, there was no decrease in production of petroleum products. Testimony before the appeals referee indicated that day-to-day maintenance was performed and that the refinery was operated in a safe and satisfactory manner.

On and after January 19, 1975, the claimants herein filed either initial or additional claims for unemployment compensation benefits. The Employment Security Division notified appellant that the claimants had filed claims and provided appellant an opportunity to submit any reasons it might have as to why the claimants had left their employment. The record shows that the employer responded to each claim but did not indicate any desire to attend a predetermination interview. The Billings employment office collected the necessary facts which were then submitted to a claims deputy, who made an initial determination of eligibility. This initial determination was upheld successively by the appeals referee of the Employment Security Division and the Board of Labor Appeals. On appeal, the District Court likewise sustained the findings of the lower administrative agencies.

The issues presented by these facts relate to the construction and application of section 87-106(d), R.C.M. 1947, of Montana's Unemployment Compensation Act. Specifically, the issues we are asked to decide are:

1. Did the District Court, in affirming the action of the lower administrative agencies, err in concluding that a "stoppage of work" as used in section 87-106(d) refers, not to the labor of the individual employee, but to the plant operations of the employer, meaning a "definite and substantial curtailment of the normal production operation?"

2. Did the District Court err in finding that functions not performed during the strike were not production or operation functions of the employer's business and therefore the employer's production did not decrease, so there was no stoppage of work at the appellant's refinery?

3. Did the Unemployment Security Division deputy lack jurisdiction to make a determination on employment claims because of the alleged failure to follow statutory notice requirements?

We shall address each issue in turn.

■ Title 87, Chapter 100, 1947 Revised Codes of Montana, governs the granting of unemployment compensation to employees in this state who are out of work. Section 87-106 provides certain instances and situations in which individuals shall be disqualified for benefits. Section 87-106(d) provides in pertinent part:

"An individual shall be disqualified for benefits * * *

"* * *

"(d) For any week with respect to which the division finds that his total unemployment is due to a *stoppage of work* which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed * * *." (Emphasis added.)

Appellant claims the term "stoppage of work" refers to the labor of the individual employee, while respondents contend that "stoppage of work" refers to a cessation or substantial curtailment of the employer's business. The crux of this case is the interpretation of this term.

Although this Court has not been called upon previously to interpret this term, several other state supreme courts have been confronted with this question. Those courts which have had to

construe the phrase "stoppage of work" as contained in the labor dispute disqualification provision of an unemployment compensation statute have almost unanimously agreed that the phrase refers to the employer's operations rather than to the individual efforts of a particular claimant for benefits. Anno. 61 A.L.R.3d 693, 697. We agree with the majority of states and conclude that "stoppage of work" as used in section 87-106(d) refers to the employer's operations rather than the individual employee's work. See, *Albuquerque-Phoenix Express, Inc. v. Employment Security Commission* (1975), 88 N.M. 596, 544 P.2d 1161, 1165.

The interpretation we have adopted is consistent with the historical construction given by British courts to this phrase as used in the British Unemployment Insurance Act, from which our section 87-106(d) derives. As explained in Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, (1950), 17 U.Chi.L. Rev. 294, 308:

"When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring 'not to the cessation of the workman's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed.' "

See also, *Ahnne v. Department of Labor and Industrial Relations* (1971), 53 Haw. 185, 489 P.2d 1397, 1400.

■ Under the well established rule that a state adopting a statute from another jurisdiction likewise adopts the interpretation given that statute by the courts of the other jurisdiction, *In re Estate of Roberts* (1959), 135 Mont. 149, 154, 338 P.2d 719, 721, this historical interpretation is persuasive, although admittedly not binding. *Cahill-Mooney Construction Co. v. Ayres*, (1962), 140 Mont. 464, 467, 373 P.2d 703, 705.

Beyond the vast weight of English and American precedents for our position, we are logically convinced that the interpretation asserted by respondents is the correct one. If the phrase "stoppage of work" were to be given the interpretation urged by appellant, it would be both a redundant and clumsy way to express the idea ap-

pellant contends it expresses. If the statute instead read simply "his unemployment is due to a labor dispute", we would not hesitate to agree with appellant that the legislature intended to disqualify from receiving benefits those employees who stop work because of a labor dispute. The legislature, however, has added a requirement that there be a "stoppage of work". This added requirement would be meaningless unless it referred to work stoppage at the plant; after all, work stoppage by the employee is taken care of by the phrase in section 87-106(d) "his employment". *Inter-Island Resorts, Ltd. v. Akahane* (1962), 46 Haw. 140, 377 P.2d 715, 720; *Monsanto Chemical Co. v. Thornbrough* (1958), 229 Ark. 362, 314 S.W.2d 493, 495; *Sakrison v. Pierce* (1947), 66 Ariz. 162, 185 P.2d 528, 532.

Section 93-401-15, R.C.M.1947, requires that in the construction of a statute, the duty of a court is "* * * simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or *to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.*" (Emphasis added.) See also, *State ex rel. Cashmore v. Anderson* (1972), 160 Mont. 175, 184, 500 P.2d 921, 926. Appellant's interpretation would require we ignore this directive by ignoring "stoppage of work". This we cannot do.

During oral argument, appellant stressed the declaration of state public policy contained in section 87-102, R.C.M.1947, and·set forth below, to support its contention that it was never the purpose of the Unemployment Compensation Law to compensate people who lost their jobs because they went on strike—that such unemployment was not "involuntary unemployment" within the contemplation of this law.

Section 87-102 provides:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. *Involuntary unem-*

*ployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its* spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure under the police powers of the state *for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."* (Emphasis added.)

Appellant further cites us to *McCarthy v. Montana Power Co.* (1963), 143 Mont. 134, 387 P.2d 438, in which a woman, in order to accompany her husband to California for three months, voluntarily terminated her employment and thereafter applied for unemployment compensation benefits. These benefits were denied on the basis of section 87-106(a) and (j), R.C.M.1947, under which an individual is disqualified for benefits if he or she leave work without good cause or for the purpose of changing residence in order to remain with his or her family. In interpreting section 87-102 in the context of these facts and for purposes of these statutes, this Court stated:

"This preamble undeniably indicates a legislative intent that the Act is not for the purpose of providing benefits for one who ceases employment for purely personal reasons, but is intended only for those who are involuntarily unemployed. When read with the specific sections that follow, the preamble is controlling." 143 Mont. at 138, 387 P.2d at 441.

Appellant thus concludes, "Unless a striking employee has been replaced, if the plant continues in operation and employment con-

tinues to be available to him, and if he chooses to honor the picket line and observe the strike * * * he is *voluntarily* unemployed, and the stated and controlling policy of the act is to deny unemployment compensatin payments to voluntarily unemployed persons." (Emphasis in original.)

In beginning our analysis of appellant's argument, we observe that the Montana Legislature has created a specific disqualification for workers who voluntarily leave work without good cause. Section 87-106(a), R.C.M.1947. This disqualification is found in the same containing the labor dispute disqualification. Section 87-106(d), R.C.M.1947. Under the rule of statutory construction—that courts must give effect to all provisions of a statute if possible, section 94-401-15, R.C.M.1947—we must conclude that the legislature did not intend these subsections to be duplicative; that is, the legislature must have intended that a person who left work because of a labor dispute be treated differently than one who left for other reasons and without good cause.

This view is supported by the analysis of the Hawaii Supreme Court of similar statutes in *Inter-Island Resorts, Ltd. v. Akahane* (1962), 46 Haw. 140, 377 P.2d 715, 724-25:

"This argument [that claimants unemployed as a result of a labor dispute are not involuntarily unemployed] is in direct conflict with the generally accepted interpretation of the voluntary leaving and the labor dispute disqualification provisions of the various state laws. The consensus supports the conclusion that the two disqualification provisions are mutually exclusive and that an individual whose unemployment is due to a 'stoppage of work' which exists because of a 'labor dispute' cannot be said to have 'left his work voluntarily' within the meaning of the voluntary separation provisions. *T. R. Miller Mill Co. v. Johns*, 261 Ala. 615, 75 So.2d 675; *Intertown Corp. v. Appeal Board of Mich. Unemployment Comp. Comm.*, supra, 328 Mich, 363, 43 N.W.2d 888; *Little Rock Furniture Mfg. Co. v. Commissioner of Labor*, 227 Ark. 288, 298 S.W.2d 56; *Marathon Electric Mfg. Corp. v. Industrial Comm.*, 269 Wis. 394, 69 N.W.2d 573, 70 N.W.2d 576; Lesser, Labor

Dispute and Unemployment Compensation, 55 Yale Law Journal 167. "* * *

"Moreover, the terms 'leaving work' or 'left his work' as used in unemployment compensation laws refer only to a severance of the employment relations and do not include a temporary interruption in the performance of services. Kempfer, Disqualifications for Voluntary Leaving and Misconduct, 55 Yale Law Journal 147, 154. Absence from the job is not a leaving of work where the worker intends merely a temporary interruption in the employment and not a severance of the employment relation. Such is the case of strikers who have temporily interrupted their employment because of a labor dispute. Under the prevailing view, they have not been deemed to have terminated the employment relationship and the voluntary disqualification has no application to them. *T. R. Miller Mill Co. v. Johns*, supra, 261 Ala 615, 75 So.2d 675; *Mark Hopkins, Inc. v. California Employment Comm.*, 24 Cal.2d 744, 151 P.2d 229, 154 A.L.R. 1081; *Knight Morley Corp. v. Michigan Employment Security Comm.*, 352 Mich. 331, 89 N.W.2d 541; *Marathon Electric Mfg. Corp. v. Industrial Comm.*, supra, 269 Wis. 394, 69 N.W.2d 573, 70 N.W.2d 576." (Footnote omitted.)

Accord *Scott v. Smith* (1962), 141 Mont. 230, 245, 376 P.2d 733, 741 ("the strike did not terminate the relationship of employer-employee * * *").

The reasoning and conclusion of the Hawaii Supreme Court that striking employees are not deemed voluntarily unemployed has specifically been adopted by the New Mexico [*Albuquerque-Phoenix Express, Inc. v. Employment Security Commission* (1976), 88 N.M. 596, 544 P.2d 1161, 1165] and Idaho [*Totorica v. Western Equipment Co.* (1965), 88 Idaho 534, 401 P.2d 817, 821] Supreme Courts and we adopt it here.

■ From this discussion it becomes clear that if a striking employee is not considered voluntarily unemployed for purposes of the specific "voluntary leaving work" provision, neither can he or she be considered voluntarily unemployed for purpose of the general statement of public policy. Therefore, there is no conflict

with section 87-102. See, *Sakrison v. Pierce* (1947), 66 Ariz. 162, 185 P.2d 528, 534-35.

This last cited case offers another rationale for resolving any conflict between the policy statement and the labor dispute disqualification, 185 P.2d at 535:

"However, even if we gave to the declaration of policy the status and dignity contended for by appellants it would avail them nothing for the reason that if the general wording of the introductory policy section of the statute heretofore quoted is inconsistent with sec. 56-1004(d), quoted supra, which is specifically concerned with disqualification due to labor disputes, the latter must control for '* * * where a statute expresses first a general intent, and afterwards and (sic) inconsistent particular intent, the latter will be taken as an exception from the former and both will stand.' 1 Lewis' Sutherland on Statutory Construction, 2d Ed., par. 268; *Rodgers v. United States*, 185 U.S. 83, 22 S.Ct. 582, 46 L.Ed. 816."

The rule stated in this excerpt has been codified in Montana, section 93-401-16, R.C.M.1947, and we are bound to follow it *Aleksich v. Industrial Accident Fund* (1944), 116 Mont. 127, 137, 151 P.2d 1016, 1020. To the extent that the statement quoted above from *McCarthy* can be read to conflict with this general rule of statutory construction, it is overruled.

Finally, appellant relies heavily on *Board of Review v. Mid Continent Petroleum Corp.* (1943), 193 Okl. 36, 141 P.2d 69, one of the very few cases supporting its view. The following excerpt quoted in appellant's brief illustrates the Oklahoma court's reasoning:

"* * * A strike in the labor sense is generally defined as a stoppage of work by common agreement of working men. 15 C.J.S. Conspiracy 1008 § 11. *That was the definition evidently in the mind of the Legislature; the term 'stoppage of work' was considered as synonymous with 'strike'.*" (Emphasis added.) 141 P.2d at 72.

In response to appellant's argument, we note that the 1977 Montana Legislature had an opportunity to amend section 87-106(d) to delete the reference to "stoppage of work" and insert in its place

"strike", thus accomplishing exactly what appellant asks us to do. House Bill 429, 45th Montana Legislature (1977). The legislature declined. House Journal of the 45th Legislature 280 (February 7, 1977). Although their declination occurred after the incidents underlying the present appeal, it is nevertheless supportive of the view that the legislature in Montana does not consider the term "stoppage of work" as synonymous with "strike" and lends further support to our view that there is no conflict between our interpretation of section 87-106(d) and the general statement of public policy found in section 87-102. Oklahoma apparently remains the only state whose highest court holds to the contrary. Anno. 61 A.L.R.3d 693, 704-05.

■ Appellant notes that in at least three jurisdictions adopting the construction of stoppage of work we adopt herein (Michigan, Arkansas and Arizona), the judicial construction was promptly reversed by legislative amendments to the statutes interpreted. We suggest that, should appellant so desire, it is to the Montana legislature it should also turn for future relief. *Inter-Island Resorts, Ltd. v. Akahane* (1962), 46 Haw. 140, 377 P.2d 715, 722. As was stated in *Sakrison v. Pierce* (1947), 66 Ariz. 162, 185 P.2d 528, 530-31:

"At the outset it should be made clear that this court is not concerned with any question relative to the merits of the labor controversy itself. Our discussion is not and cannot be determined by such factors. Instead it is determined by the choice that the elected legislative representatives of the people of this state have made for us. And whether or not the Act should compensate employees in this position is properly a choice for the legislature. * * * The function of this court, then, is simply to point out which route our legislature has chosen to travel."

For the above reasons we hold that the term "stoppage of work" as used in the context of our Unemployment Compensation Law refers to the employer's business rather than the employee' labors. This does not complete our task, however, for appellant asserts that even under this interpretation, the District Court erred in finding that no stoppage of work occurred at the refinery. Appellant con-

tends that the court should have considered the refinery's total operation, rather than mere production of its final petroleum products, and notes that during the strike such nonproduction activities as employee training, crude budgeting, construction projects, and planning ceased. Thus, appellant contends that, looking at the total operations of the refinery, there was a stoppage of work and therefore claimants should be disqualified from receiving unemployment benefits. We disagree.

We do agree that the "stoppage of work" necessary to disqualify an employee from receiving benefits need not be absolute; that is, it is not necessary that all activities of the employer cease before a finding of a "stoppage of work" may be made. *Cumberland and Allegheny Gas Co. v. Hatcher* (1963), 147 W.Va. 630, 130 S. S.E.2d 115, 120. However, the correct test, as applied by other courts, is that there must be a substantial curtailment of operations in the employer's business to constitute a stoppage of work within the meaning of section 87-106(d). *Ahnne v. Department of Labor and Industrial Relations* (1971), 53 Haw. 185, 489 P.2d 1397, 1400; *Mountain States Telephone & Telegraph Co. v. Sakrison* (1950), 71 Ariz. 219, 225 P.2d 707, 711; Anno. 61 A.L.R.3d 693, 705.

What constitutes a stoppage of work or a substantial curtailment of operations at the employing establishment has generally been regarded by the courts as a question dependent upon the facts and circumstances of each case. *Albuquerque-Phoenix Express, Inc. v. Employment Security Commission* (1975), 88 N.M. 586, 544 P.2d 1161, 1166; Anno. 61 A.L.R.3d 693, 706. And, as with all questions of fact, the findings of the District Court are entitled to great weight. It is not our function in reviewing findings of fact to substitute our judgment for that of the District Court, but rather to determine whether there is substantial evidence to support the lower court's findings. *Olson v. Westfork Properties, Inc.* (1976), 171 Mont. 154, 557 P.2d 821, 823.

Nevertheless, appellant's argument does raise an interesting question: Exactly what must the District Court consider in deter-

mining whether there was a stoppage of work at appellant's refinery—the refinery's total operation or the refinery's final product output only?

The findings of the District Court on this matter were as follows:

"4. The records of the employer on file with various state agencies disclosed that from January 18, 1975 until the strike ended, the employer utilized the services of imported replacement personnel from the employer's out-of-state refineries and at no time during the period of the strike, was there a decrease in the production of petroleum products. Day to day maintenance was performed and the refinery was operated in a safe manner. Any functions not performed were not production or operational functions of the employer's business."

The District Court opted for the more limited view of appellant's operation, that of measuring final product output, while appellant urges us to adopt the broader view and look to nonproduction related matters such as training, planning, budgeting, etc. in determing whether a stoppage of work occurred at appellant's refinery. We conclude that the District Court selected the proper measure.

In testimony elicited from the refinery manager before the appeals referee, it was admitted that the prime purpose, the *raison d'etre*, of the refinery was the refinement of crude oil into various petroluem products. It was further admitted that during the strike, production output was at or above normal. Although it is not completely clear from the transcript, it appears that the striking employees were chiefly engaged in production and maintance, which continued at normal levels during the strike, and had no or only tangential connection with any of the planning or engineering functions curtailed during the strike.

Clearly, in determining whether there is a stoppage of work at the plant such as appellant's which is engaged in the production of a final product or set of final products, the first and major measure must be weather such production is curtailed or stopped. *Meadow Gold Dairies-Hawaii, Ltd. v. Wiig* (1968), 50 Haw. 225, 437 P.2d 317, 319; *Cumberland and Allegheny Gas Co. v.*

*Hatcher* (1963), 147 W.Va. 630, 130 S.E.2d 115, 123; *Monsanto Chemical Co. v. Thornbrough* (1958), 229 Ark. 362, 314 S.W.2d 493, 496.

In *Monsanto* the strike by employees initially resulted in a complete plant shutdown (during which the striking employees did not apply for unemployment benefits) after which Monsanto, by utilizing the services of supervisory personnel, was able to resume production. The Arkansas Supreme Court, in holding the employees eligible for benefits during this latter period of production, stated:

"The appellant insists that the stoppage of work must be held to have continued until the plant's production was again entirely normal in every respect * * * We are of the opinion, however, that the stoppage ends when the employer regains production to a point at which his business operations are substantially normal. * * *

"Here the proof shows that, in terms of barrels, Monsanto's output [during the strike] was roughly the equivalent of normal production.* * * On the record as a whole we do not feel justified in holding that the Board's findings are unsupported by any substantial evidence." 314 S.W.2d at 496.

At least one commentator supports our reliance on production decrease as the measure for determining what constitutes substantial curtailment or stoppage of work for purposes of unemployment compensation eligibility. Professor Jerre Williams, in a survey of cases decided on facts similar to the instant case, concluded:

"While various factors obviously would enter in, the courts tend to concentrate on the diminution of the activities of production in determining the question of existence of a stoppage of work. The critical breaking point would seem to be about a 20 to 30 per cent cut in production as being sufficient to establish a stoppage." Williams, the Labor Dispute Disqualification, 8 Vand.L.Rev. 338, 340 (1955).

 Although it is neither possible nor desirable to establish an arbitrary percentage as to when a work stoppage does or does not exist, we cannot say here, as a matter of law, that the District Court and the various administrative tribunals were incorrect in finding

no work stoppage at appellant's refinery, after considering all of the evidence before them.

■ We do not accept, therefore, the proposition that whenever a labor dispute forces a change in an employer's method of operation or causes a curtailment of some activities within the plant, there per se exists a stoppage of work. *Meadow Gold Dairies-Hawaii, Ltd. v. Wiig* (1968), 50 Haw. 225, 437 P.2d 317, 320-21.

■ The final issue raised for our consideration concerns the jurisdiction or lack thereof of the Employment Security Division deputy to make the initial determination of eligibility of the claimants for unemployment compensation benefits. Appellant asserts that the Division failed to comply with section 87-107(b), R.C.M.1947, which states in part:

"No determination or redetermination of an initial or additional claim shall be made under this section unless five (5) days' notice of the time and place of the claimant's interview for examination of the claim is mailed to each interested party."

The alleged failure is that no claimant's interviews were ever scheduled and that no notice of any such interviews was ever sent to interested parties. The prejudice allegedly resulting to appellant is that: "From that point on, without there ever having been any hearing at all, the employer has been in the position of the appellant with all of the burdens imposed upon an appellant. We think that the employer was entitled at some point to have the matter considered and an opportunity to be heard and to present the case when both parties were in an equal position before the administrative officer."

It is hornbook law that there is no violation of due process in making an administrative determination without a hearing if a hearing may be had on application to an administrative tribunal for reconsideration or review; whether by trial de novo or for the correction of errors; or in a proceeding to suspend or set aside the order. *Gonzales v. United States* (1960), 364 U.S. 59, 80 S.Ct. 1554, 4 L.Ed.2d 1569; 2 Am.Jur.2d Administrative Law § 406.

In *Gonzales* a draft registrant appealed his reclassification by his

local draft board from a religious deferment to 1-A on the ground that he had been denied a procedural hearing. The Supreme Court rejected his claim stating:

"Petitioner first contends that the Department denied him procedural due process by not giving him timely opportunity, before its final recommendation to the appeal board, to answer the statement of the local board as to his claim of devoting 100 hours to actual preaching. But the statement of the local board attributing this claim to petitioner was in his file. He admitted that he knew it was open to him at all times, and he could have rebutted it before the hearing officer. This he failed to do, asserting that he did not know it to be in his file. Apparently, he never took the trouble to find out. Nevertheless, he had ample opportunity to contest the statement before the appeal board. After the recommendation of the Department is forwarded to the appeal board, that is the appropriate place for a registrant to lodge his denial. This he did. * * * We fail to see how such procedure resulted in any prejudice to petitioner's contention, which was considered by the appeal board and denied by it. As was said in *Gonzales* [(1955), 348 U.S. 407, 412-13, 75 S.Ct. 409, 412, 99 L.Ed 467, 472], 'it is the Appeal Board which renders the selective service determination considered "final" in the courts, not to be overturned unless there is no basis in fact.'" 364 U.S. at 62-63, 80 S.Ct. at 1556-57, 4 L.Ed.2d at 1572-73.

This situation is analogous. Appellant was notified that its striking employees has applied for benefits and was given an opportunity to state its case at a fact finding proceeding with the claimants by simply checking a box on the back of Form 202A, a carbon copy of each employee's claim form sent to appellant by the Division. With a single exception, this it failed to do.

Since the initial determination of the deputy, appellant has had four occasions at which to be heard and to present its case before four tribunals, the appeals referee of the Employment Security Division, the Board of Labor Appeals, the District Court of the Thirteenth Judicial District, and now this Court, each of which is empowered to reverse the initial determination of the deputy. None

of these reviewing bodies has seen fit to reverse the deputy's initial determination as to the eligibility of the claimants for these benefits.

■ In view of the extensive reviewing process in which appellant has participated fully and ably, we are unable to see any substantial failure of due process as a ground for reversal. Rule 61, M.R.Civ.P.

■ Even though a hearing may not be constitutionally required at the initial determination level, we further conclude that the notification procedure currently followed by the Employment Security Division notifies an employer that its employee has filed a claim for benefits and gives the employer an opportunity to request and attend a predetermination hearing, satisfies the statutory notice requirement of section 87-107(b).

In *Phillips v. Dawson* (W.D.Ky.1975), 393 F.Supp. 360, 363, the federal district court rejected a similar challenge to a similar procedure stating:

"Another practice followed by the state defendants that is clearly in conflict with the holding of [*California Department of Human Resources Development V. Java* (1971), 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666] is that of requiring an investigation in those cases where the state agency has called the employer and received an indication from him that he does not wish to contest the eligibility of the applicant. Mr. Chief Burger used the following words to describe this practice, see 402 U.S. at p. 134, 91 S.Ct. at p. 1355.

"'It would frustrate one of the Act's basic purposes—providing a substitute for wages—to permit an employer to ignore the initial interview or fail to assert and document a claimed defense, and then effectuate cessation of payments by asserting a defense to the claim by way of appeal. If the employer fails to present any evidence, he has in effect defaulted, and neither he nor the State can with justification complain if, on a *prima facie* showing, benefits are allowed.'"

See also, *"Horsman Dolls v. Unemployment Compensation Commission* (1951), 7 N.J. 541, 82 A.2d 177, 181.

The judgment of the District Court is affirmed.

MR. CHIEF JUSTICE HASWELL and JUSTICES HARRISON, SHEA and SHEEHY concur.