No. 82-106

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

CITY OF BILLINGS,

Petitioner and Respondent,

-vs-

STATE OF MONTANA BOARD OF LABOR APPEALS,
MONTANA STATE DEPARTMENT OF LABOR AND
INDUSTRY AND 325 MEMBERS OF LOCAL #190, et al.,

Respondents and Appellants,

and

DECKER COAL COMPANY,

Intervenor.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert H. Wilson, Judge presiding.

Counsel of Record:

For Appellants:

Hilley & Loring; Emilie Loring, Great Falls, Montana
R. Scott Currey, Dept. of Labor, Helena, Montana

For Respondent:

Kenneth D. Peterson, Billings, Montana

For Intervenor:

Holland & Hart; Carey E. Matovich, Billings, Montana

Submitted:    March 24, 1983

Decided:    May 10, 1983

Filed:    MAY 10 1983

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appellants (claimants) appeal from a decision of the District Court, Thirteenth Judicial District, Yellowstone County, which in effect held that the claimants were not entitled to unemployment insurance benefits.

We find two principal issues arise in this appeal. The first is procedural (raised by us), whether MAPA (Montana Administrative Procedure Act) applies to agency and court handling of claims for unemployment insurance benefits (for brevity "claims"). The second issue is substantive, whether a stoppage of work occurred which disqualified claimants for benefits.

We hold that MAPA does not apply to the determination of such claims; and that the claimants in this case are entitled to unemployment insurance benefits.

On April 24, 1980, 379 employees of the City of Billings went on strike. The strike was settled on May 10, 1980, and the striking employees returned to work on May 12, 1980. During the strike, 325 employees filed claims. A deputy of the Department of Labor and Industry made an initial determination that the claimants were not eligible for unemployment insurance benefits because a stoppage of work occurred during the strike. (Section 39-51-2305, MCA.)

The adverse decision of the deputy was appealed by the claimants to an appeals referee who sustained the deputy's decision, finding that a work stoppage existed. The claimants appealed the decision of the appeals referee to the Board of Labor Appeals. After reviewing the record before the appeals referee, and hearing argument, the Board reversed

the decision of the appeals referee, finding that there was not a sufficient work stoppage to disqualify the claimants.

The decision of the Board of Labor Appeals in turn was appealed by the City of Billings to the District Court. After receiving briefs and hearing oral argument, the District Court reinstated the decision of the appeals referee.

Thereafter the District Court entered judgment holding that there was a work stoppage in the City of Billings as contemplated by law due to the strike, and that the claimants were disqualified from receipt of unemployment insurance benefits for the period of the strike because of the work stoppage.

The judgment of the District Court has been appealed by the claimants to this Court.

DOES MAPA APPLY TO CLAIMS FOR UNEMPLOYMENT INSURANCE BENEFITS?

We note that the statutory scheme at the agency level for handling unemployment insurance benefits claims has been the same with slight variations since the Unemployment Insurance Law was first enacted in 1937 (Ch. 137, § 6, Laws of Montana (1937)). Since its enactment, the law has provided for an initial determination of claims by a deputy, for an appeal from the deputy to an appeals tribunal or appeals referee, and for an appeal from the appeals tribunal or referee to the State Unemployment Compensation Commission, and since executive reorganization in 1971, to the Board of Labor Appeals. The original enactment (Ch. 137, § 6, Laws of Montana (1937)) also provided for District Court review from the [commission's] determination and provided that in the District Court, the findings of the commission as to facts,

if supported by the evidence and in the absence of fraud, were deemed to be conclusive, and the review jurisdiction of the District Court was confined to questions of law.

There is contained within the Unemployment Insurance Law itself, without regard to MAPA, a complete procedure for hearing and determining disputed claims for unemployment insurance benefits, beginning with the deputy and ending in the Montana Supreme Court.

Under the Unemployment Insurance Law, the initial determination of a claim is to be made by a deputy of the Department of Labor and Industry. Section 39-51-2402, MCA. An adverse decision by the deputy may be appealed to an appeals referee. Section 39-51-2402(4), MCA. After a hearing, the appeals referee is required to make findings and conclusions promptly and on the basis thereof affirm, modify, or reverse the deputy's determination. Section 39-51-2403, MCA.

Any interested party dissatisfied with the decision of an appeals referee may appeal to the Board of Labor Appeals. Section 39-51-2404, MCA. An appeal from the Board's decision to the District Court may be had under the provisions of section 39-51-2410, MCA. The decision of the District Court may be appealed to the Supreme Court of Montana in like manner as other civil cases. Section 39-51-2410(6), MCA.

In this case, however, the District Court applied the provisions of MAPA, particularly section 2-4-621, MCA, instead of applying the Unemployment Insurance Law. In reversing the holding of the Board of Labor Appeals, the District Court stated here:

> "The Board of Labor Appeals is held to the same standard of review as is this Court. The Board cannot substitute its judgment for that of the

- 4 -

appeals referee as to the weight of the evidence on questions of fact. The board may reverse or modify the decision of the appeals referee only if substantial rights of the parties have been prejudiced because such administrative findings and conclusions are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record. (Yanzick v. School District, February 1, 1982, 39 St.Rep. 191)."

Thus the District Court determined, and the City here contends, that the Board of Labor Appeals could not reject or modify the findings of fact of the appeals referee unless the Board first determined from a review of the complete record that the findings of fact of the appeals referee were not based upon competent, substantial evidence or that the proceedings on which the findings were based did not comply with essential requirements of law.

There is no statutory basis in the unemployment insurance law upon which the District Court could have relied in placing such a fence around the power of the Board of Labor Appeals to review a decision by an appeals referee. Section 39-51-2404, MCA, provides:

"Appeal to the Board. Any interested party dissatisfied with a decision of an appeals referee is entitled to appeal to the board. The department will promptly transmit all records pertinent to the appeal to the board. When a decision is rendered by the board with copies of such decision to all interested parties, including the department, that decision shall become final unless an interested party requests a rehearing or initiates judicial review . . ."

There is no limitation upon the Board's power of review in that paragraph. We are guided, however, by companion statutes which determine the function of the board. In section 39-51-310, MCA, it is said:

"Function of Board. The board shall act in a quasi-judicial capacity for the hearing of disputes concerning the administration of Montana's unemployment insurance laws."

Under the Executive Reorganization Act, the Board of Labor Appeals is a quasi-judicial board. Section 2-15-1704, MCA. The functions of a quasi-judicial board are defined in section 2-15-102(9), MCA, and they include:

> "'Quasi-judicial function' means an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies. The term includes but is not limited to the functions of interpreting, applying, and enforcing existing rules and laws;. . . determining rights and interests of adverse parties; evaluating and passing on facts;. . . adopting procedural rules; holding hearings, and any other act necessary to the performance of a quasi-judicial function."

The holding of the District Court here as to the review power of the Board of Labor Appeals stripped the Board of its quasi-judicial function. Obviously, by statute, the Board of Labor Appeals, in determining disputed claims, acts in a quasi-judicial capacity since it is a quasi-judicial board. Section 39-51-310, MCA. The fundamental purpose of the Supreme Court is to ascertain and give effect if possible to the intention of the legislature in construing the Unemployment Insurance Law (McCarthy v. Unemployment Compensation Commission (1963), 143 Mont. 134, 387 P.2d 438)). We therefore determine that the Board of Labor Appeals is not confined in its review of disputed benefits claims to the restrictions imposed by the District Court in this case.

As a quasi-judicial board, the Board of Labor Appeals may consider not only the record made before the appeals referee, but new evidence produced at the board hearing. Manifestation of this is found in section 24.7.306, Administrative Rules of Montana (A.R.M.), which provides:

> "(1) The board shall include in the record and consider as evidence all records of the Division that are material to the issues. The board shall

- 6 -

> also consider any new material evidence introduced
> at the board hearing by interested parties. As
> soon as possible after the hearing, the board shall
> render a written decision which shall state the
> findings of fact and the reasons for the decision.
> Copies of such decision shall be mailed to all
> interested parties."

It is easy to demonstrate that MAPA does not apply to claims for unemployment insurance benefits. To begin with, MAPA itself excepts from its provisions procedures imposed by other statutes or otherwise recognized law. Section 2-4-107, MCA. Since there is a complete procedure for the handling of claims under the Unemployment Insurance Law, MAPA by its terms does not apply.

Moreover, an examination of the underlying statutes and provisions in MAPA for hearing contested cases will show that the MAPA provisions are unworkable when an attempt is made to apply them to claims for unemployment insurance benefits. MAPA is silent as to whether a deputy should make an original determination of a claim. In a contested claim under MAPA, a hearing examiner may be appointed (section 2-4-611, MCA) who must proceed to a hearing (section 2-4-612, MCA). In a contested case, where the majority of the agency officials who must make the final decision who have not heard the case, there must be a "proposal for a decision" by the hearing examiner. Section 2-4-621, MCA. The District Court relied on section 2-4-621, MCA, in holding that the Board of Labor Appeals may not reject or modify the appeals referee decision unless the Board determined "that the findings of fact were not based upon competent substantial evidence." However, section 2-4-621, MCA, can only apply when an agency is sitting in review of a "proposal for decision" by a hearing examiner. In this case, the decision of the appeals referee was not a "proposal for decision;" it was a definitive

- 7 -

holding adverse to the claimants, which if not appealed, would have become final in its effect.

Actually, it is the District Court itself which is strictly limited under the unemployment insurance law in its review of the decision of the Board of Labor Appeals. Section 39-51-2410(5), MCA, provides:

"In any judicial proceeding under 39-51-2406 through 39-51-2410, the findings of the board as to facts, if supported by evidence and in the absence of fraud, shall be conclusive and the jurisdiction of said court shall be confined to questions of law . . ."

Here the District Court, in reviewing the Board's decision, did not follow the provisions of section 39-51-2410(5), MCA, by determining if the findings of the Board were supported by evidence. Instead, it applied an incorrect interpretation of statutory law to determine that the Board had no power to overturn the fact-findings of the appeals referee. Plainly, this constituted error.

DID A STOPPAGE OF WORK OCCUR WHICH DISQUALIFIED CLAIMANTS?

In appeals to this Court, when we determine that the District Court applied an incorrect interpretation of law or overlooked a statute in determining facts, we ordinarily, instead of determining the ultimate conclusion ourselves, remand to the District Court for further proceedings under the correct interpretation of law or statute. Two factors militate against such action here.

First, it is the intent of the Unemployment Insurance Law that claims for benefits be given accelerated judicial attention. The District Court is required to hear appeals from the Board of Labor Appeals in a summary manner, giving precedence to all other civil cases except for those arising under the Workers' Compensation law. Section 39-51-2410(5),

- 8 -

MCA. Obviously, the legislature intended that claims for unemployment benefits be given the quickest possible judicial determination.

Secondly, the District Court in this case did not end with determining that the Board of Labor Appeals had no power to set aside the fact-findings of the appeals referee. The District Court went further and concluded that the decision of the appeals referee (not the Board) was not clearly erroneous and that there was substantial evidence in the record to support the decision of the appeals referee. Thus the District Court has predetermined an issue which ordinarily we would remand for determination. The judgment of the District Court determined that "there was a work stoppage" which disqualified the claimants from benefits. The Board of Labor Appeals had determined that "the evidence overwhelmingly establishes that within the meaning of the term 'stoppage of work'. . . there was no significant reduction in the ultimate services performed to the residents of Billings." The appeal by the claimants to this Court squarely places upon us the duty to determine if the findings of the Board are supported by evidence as set forth in section 39-51-2410(5), MCA, and if so, whether the Board properly applied the law to those facts.

Essentially, the Board of Labor Appeals determined that during the short period of the strike, supervisory personnel of the City were able to take over the governmental services provided by the City to the public and that such services were not reduced in any substantial degree.

The Board found "the evidence establishes that the critical government functions of providing police and fire protection, sewage disposal, and water, were not diminished

- 9 -

in any significant amount, if at all, but such services were furnished to the public without any significant interruption or diminution no matter how they may have been furnished." We find the record supports the board in those findings.

With respect to sewage, there were garbage collection points set up to which residents had to walk or carry garbage, but apart from that there was no pile-up of garbage on the streets in the manner that other cities have suffered.

The Board further found "the evidence does establish that there was some delay in patching holes in the streets and some delay in performing work in the public parks, however, there is not any evidence to establish that the public's enjoyment of the parks was in any way interrupted or reduced or that on a long-term basis, there was any diminution in the maintenance and upkeep thereof." Our search of the record reveals nothing to negate these findings.

Going on, the Board found "although there was some reduction in the bus service, the evidence supports the finding and it is the finding of this Board that approximately 90 percent of the passengers that are ordinarily served in a period other than a strike were served during the course of the strike." The record shows that although the number of bus runs were reduced from 11 each day to 7 each day, those runs that were maintained during the strike were the runs that accomodated rush-hour traffic; therefore the 90 percent figure found by the Board is valid and was testified to in the record.

Next the Board found, "there was no diminution in the services furnished to the public insofar as the functioning

of the cemetery is concerned." The finding states the record.

The Board found "the evidence further establishes that upon the return to work even by office personnel, there was no backlog of paperwork to be performed upon their return. We find this is undisputed in the record.

The Board found "although it is suggested by the appeals referee that there had to be a stoppage of work where there are this many people in the governmental agency out on a labor dispute, the conclusion is equally fair to say, considering the short period of the strike, that the supervisory personnel without people to supervise were capable of carrying on these functions." The statements by the appeals referee and by the Board are merely argumentative.

Again the Board found "the evidence further establishes that many of the people who are working for the City are in a caretaker or watchtaker type of function and there were no emergencies that came about and caused disruption to the service to the public during the short period of the strike." These findings are supported. There were several kinds of jobs which required routine checking of machines or gauges, water tests, greasing, oiling and patching and other such functions which, while postponed, or performed partially by supervisory personnel, resulted in no disruption of service to the public. At least the record does not show any such disruption.

The City had argued before the appeals referee, based upon testimony from its management personnel, that the man-hours (the City's expression) available to it had been reduced by the strike. The City supplied lists of large

- 11 -

reductions of work hours performed in its civil departments to show there was a stoppage of work. The appeals referee adopted the City's contentions in this regard. The Board of Labor Appeals rejected that methodology saying that the percentages were not supported in any substantial degree when looked upon from the standpoint of the services furnished to the public by the government of the City of Billings.

Since we find that the essential facts found by the Board of Labor Appeals are supported by substantial evidence in the record, the question that remains to us is did the Board properly determine that there was not a "stoppage of work" as that term is used in the unemployment insurance law.

The applicable statute is section 39-51-2305(1), MCA.

"Effective April 1, 1977, an individual shall be disqualified for benefits for any week with respect to which the department finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed . . ."

In examining the statute, note that the inclusion of the phrase "stoppage of work" by the legislature is not intended to be a synonym for "strike," or "lockout." If the legislature meant that a striking or locked out employee would be disqualified for benefits it had only to eliminate the phrase "stoppage of work" so as to make the section read that the individual is disqualified for benefits if his total unemployment is "because of a labor dispute at the factory." When the legislature inserted the words "due to a stoppage of work," it meant that the factors to be considered in connection with disqualification meant more than that the individual claimant was on strike, or locked out in a labor

dispute. There may be a labor dispute, and yet no stoppage of work.

Montana has aligned itself with the majority of courts holding on the question that the phrase "stoppage of work" refers to the employers' operations rather than to the individual employee's work. Continental Oil Company v. Board of Labor Appeals (1978), 178 Mont. 143, 582 P.2d 1236. This so-called "American rule" allows strikers to collect benefits so long as their activities have not substantially curtailed the productive operations of their employer. See New York Telephone Company v. New York Department of Labor (1979), 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553, note 24; Hawaiian Telephone Company v. Hawaii Department of Labor and Industrial Relations (D. Haw. 1976), 405 F.Supp. 275, 287-288, cert.den. 435 U.S. 943, 98 S.Ct. 1522, 55 L.Ed.2d 539.

Application of the American rule under statutes similar to Montana's stoppage of work provision brought about the constitutional question of whether the Supremacy Clause of Art. VI of the United States Constitution was contravened by disrupting the operation of federal labor policy requiring state neutrality in the collective bargaining process. The question is answered in the Ninth Circuit by virtue of the decision of Hawaiian Telephone Company v. State of Hawaii (9th Cir. 1980), 614 F.2d 1197, cert.den. (U.S.) 100 S.Ct. 2965, 64 L.Ed.2d 840 (1981). In that case it was held that federal policy did not preempt the adoption of a work stoppage statute in the state of Hawaii.

As the federal court noted in Hawaiian Telephone, supra, the wisdom or even the fairness of such economic legislation is not before us, nor do we pass upon its merits. The

- 13 -

determination of legislative economic policy is for the legislature, not us. What the legislature has granted, it can take away. We note that after the New Mexico Supreme Court had interpreted the phrase "stoppage of work" to mean a substantial curtailment of the employers productive operations (Albuquerque Express v. Employment Security Commission (1975), 88 N.M. 596, 544 P.2d 1161), New Mexico amended its laws to eliminate the work stoppage language. N.M. Stat. Annot. 51-1-7(D) (1979).

Even so, courts have divided on how to apply the "substantial curtailment" interpretation of stoppage of work. See 61 A.L.R.3d 693. The case we find nearly analogous to the case at bar is Cumberland and Allegheny Gas Company v. Hatcher (W.V. 1963), 130 S.E.2d 115. In that case, a gas company claimed an 80 percent curtailment in its overall activities based on the proportionate relation of the number of employees affected by the lockout to the total number of employees of the company in all categories including supervisory, managerial and clerical employees. The gas company claimed that during the period no work was done on meter changes, there was no handling of routine service orders, no domestic meter-reading work was performed, no work was performed on constructing new lines, or the renewal of old lines, no meter tasks were performed, no routine inspection work, installation of parts on customer's appliances, nor houseline plumbing was performed. All maintenance and building work ceased during the entire period and all engineering and design work ceased. Nevertheless, the West Virginia Court found that there was no substantial showing of unfulfilled customer demands or unfulfilled requirements in those categories during the lockout, nor any

accumulated backlog of work or services requiring overtime or additional personnel after the lockout, nor any reduction in the service and delivery of gas to the company's customers. Moreover, the West Virginia Court saw no distinction between a public utility supplying natural gas to its customers and other types of employers. In the same manner, we see no distinction in applying the stoppage of work American rule to a governmental employer, as distinguished from any other type of employer.

West Virginia also noted the same kind of problem that we have in the case at bar:

> "A determination of the existence or nonexistence of a stoppage of work in a case of this nature must necessarily depend upon the facts of each case. It cannot be determined solely on the basis of the proportionate number of employees affected. It is conceivable that in some situations, a strike or lockout affecting relatively few employees would produce a stoppage of work if such men were employed in the performance of duties of such vital nature that their unemployment would result in a substantial curtailment of the normal overall activities or operations of the employer. On the other hand, in other situations, the unemployment of a proportionately greater number of employees might have no substantial effect on the normal activities of the employer. In some situations, a substantial curtailment of work in a single category or department of the employer's operations might be of such vital a nature as to result in a substantial curtailment of the employer's overall activities if all categories or departments were of an interdependent nature; while, conceivably, in another and different situation, a complete cessation of work in a single category or department of some incidental or minor nature might produce no appreciable curtailment of the overall operations of the employer."

We hold therefore, that the Board of Labor Appeals in this case correctly determined the application of the phrase "stoppage of work." The City of Billings is engaged in delivering municipal government services to persons and property within its jurisdiction. In objecting to the claims of the claimants, it has failed to establish a substantial

curtailment of its normal operations in delivering such governmental services. It cannot be said, therefore, as a legal proposition under the Unemployment Insurance Law, that there was a stoppage of work brought about by the strike. We hold that the Board of Labor Appeals correctly applied the correct rule of law to the findings of fact which it made on substantial evidence.

Accordingly, the judgment of the District Court is reversed and the order of the Board of Labor Appeals is reinstated.

_John C. Sheehy_
Justice

We Concur:

_____
Chief Justice

_Daniel J. Shea_

_____

_____

_Frank I. Haswell_

_____
Justices

Mr. Justice John Conway Harrison concurring:

I concur, but desire to draw one point to the attention of the legislature, as was done in New Mexico in the case of Albuquerque Express v. Employment Security Commission (1975), 88 N.M. 596, 554 P.2d 1161. The fact that we have arrived at a situation to the law presented to us where in interpreting the phrase "work stoppage" we may well be creating economic problems for all employers.

It is quite possible and foreseeable, that in a case where the National Guard is called during a work stoppage to perform the services of municipal or state employees, that there could be a finding by the Board of Labor Appeals that there was no substantial curtailment of normal operations in delivering governmental services. I cannot believe that such was the legislative intent in giving to the Board of Labor Appeals such power.

John Conway Harrison
Justice

Mr. Chief Justice Frank I. Haswell, dissenting:

I would vacate the judgment of the District Court and remand this case for decision under the correct standard of review. In my view, the majority of this Court have usurped the statutory function of the District Court in appeals under the Unemployment Compensation Act.

The essential facts of this case bear repeating. The deputy in the department examined the claims and found claimants ineligible for unemployment compensation benefits because there had been a work stoppage in the City of Billings. Thereafter, following an extensive hearing in which testimony was taken, written exhibits received and briefs filed, the appeals referee entered findings to the same effect. Finally, the Board of Labor Appeals, on the same record, entered contrary findings that there was no work stoppage and ordered unemployment compensation benefits paid. The matter was appealed to the District Court, who reviewed the decision of the appeals referee, found "reliable, probative and substantial evidence on the whole record" supporting the decision of the appeals referee and that such decision was not "clearly erroneous," reversed the decision of the Board of Labor Appeals, and reinstated the decision of the appeals referee. The judgment of the District Court has been appealed to us for review.

The correct statutory standard of judicial review by the District Court provides in pertinent part:

> "In any judicial proceeding . . . the findings of the board [of labor appeals] as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive and the jurisdiction of said [district] court shall be confined to questions of law . . ." Section 39-51-2410(5), MCA. [Bracketed words inserted.]

-17-

The District Court did not apply this standard of judicial review.  Instead, the District Court applied the review procedure in the Montana Administrative Procedures Act, considered the appeals referee to be the fact-finder, found his decision supported by substantial evidence and not clearly erroneous, and reversed the Board of Labor Appeals.

If the statutory appeal procedure means anything, it requires the District Court to review the evidence under the proper standard of judicial review in the first instance, determine whether the findings of fact by the Board of Labor Appeals are supported by the evidence, and apply the law on eligibility for unemployment compensation benefits.  This function requires the District Court to exercise its discretion in determining what are findings of fact and what are conclusions of law.  More specifically, is the existence of a work stoppage a question of fact or a conclusion of law under the Unemployment Compensation Act?  We, in turn, review the District Court judgment to determine whether the District Court abused its discretion.

The majority have by-passed the statutory appeal procedure in the name of expediency and their conclusion that the District Court has predetermined the issue of work stoppage.  In so doing, they have eliminated the discretion lodged in the District Court and assumed that discretion themselves.

I find no authority in the Unemployment Compensation Act that permits the Board of Labor Appeals to make findings directly contrary to the appeals referee on the same, identical evidence. The majority have held, at least by implication, that the Board of Labor Appeals can redetermine de

-18-

novo the credibility of witnesses, the weight to be given their testimony, and what the evidence proves without regard to the findings of the department deputy or the appeals referee. In so doing, they have created an omnipotent agency of government evading judicial review.

In this case the Board of Labor Appeals has made no finding on six of the departments of the City of Billings-- specifically, the sanitation department, the traffic depart- ment, the library, the airport, the department of support services, and the city-county planning department. Instead, the Board of Labor Appeals has made general findings that the critical governmental functions of providing police and fire protection, sewage disposal and water were not diminished in any significant amount. What are "critical governmental functions" and what is the meaning of "any significant amount"? The Board of Labor Appeals has also made a general finding that there was no significant reduc- tion in services as a whole and no evidence that entire services to the City were diminished 10 percent. The Board also found that there was no significant reduction in ser- vices to the City of Billings and that supervisory personnel with no one to supervise could carry on the functions. This is tantamount to a finding that the 379 striking employees performed no significant services to the people of Billings.

The appeals referee, on the other hand, found that in the sanitation department twenty-eight routes are normally serviced but only eight could be serviced because of lack of manpower and that homeowners had to haul their garbage to collection points in parks or to the dump. The appeals referee also found that the street department usually used

200 tons of asphalt each week to patch the potholes, but that during the strike only two tons were used and that the street sweeping and cleaning could not be performed. The appeals referee found that bus service was curtailed and some routes and schedules were abandoned and that during the strike there were 22,750 fewer passengers than normally ride the buses. The appeals referee found that library hours were reduced and some library programs discontinued.

The foregoing are examples of the contrary findings of the appeals referee and the Board of Labor Appeals on the same evidence. Who can say with certainty what are findings of fact and what are conclusions of law? This is the function of the District Court, and our function is to determine whether the District Court abused its discretion.

For the foregoing reasons, I would remand the case to the District Court for judicial review under the correct standard of review.

_____
Chief Justice

Mr. Justice L. C. Gulbrandson:

I concur in the foregoing dissent of Chief Justice Haswell.

_____
Justice

Mr. Justice Fred J. Weber:

I concur in the foregoing dissent of Chief Justice Haswell.

_____
Justice

-20-