No. 82-359

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

DECKER COAL COMPANY, a joint venture between
Western Minerals, Inc., an Oregon corporation
and Wytana, Inc., a Delaware corporation,

                          Petitioner and Respondent,

        vs.

EMPLOYMENT SECURITY DIVISION OF THE MONTANA
STATE DEPARTMENT OF LABOR AND INDUSTRY and
THOSE MEMBERS OF THE PROGRESSIVE MINE WORKERS
OF AMERICA, Sheridan, Wyoming, who are
Claimants in Board of Labor Appeals Decision
No. 2601,

                          Respondents and Appellants.

---

Appeal from:  District Court of the Thirteenth Judicial,
              In and for the County of Big Horn
              Honorable Robert Wilson, Judge presiding.

Counsel of Record:

    For Appellants:

        Hilley and Loring, Great Falls, Montana
        Emilie Loring argued, Great Falls, Montana
        R. Scott Currey argued, Helena, Montana

    For Respondent:

        Holland & Hart, Billings, Montana
        Carey E. Matovich argued, Billings, Montana

---

                          Submitted:  March 24, 1983

                          Decided:  July 5, 1983

Filed:    JUL 5 1983


_____
                          Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appellants (collectively hereafter "claimants") appeal from a decision of the District Court, Thirteenth Judicial District, ~~Yellowstone~~ Big Horn County, which in effect held that claimants were not entitled to unemployment insurance benefits.

Two principal issues arise in this appeal. The first is procedural, raised by us, whether MAPA (Montana Administrative Procedure Act) applies to agency and court handling of claims for unemployment insurance benefits (for brevity "claims"). The second issue is substantive, whether a stoppage of work occurred which disqualified claimants for benefits.

We hold that MAPA does not apply to the determination of such claims; and that the claimants in this case are entitled to unemployment insurance benefits.

Nearly all members of Local 1972, Progressive Mineworkers of America, employees of Decker Coal Company, filed claims for unemployment compensation benefits for the period from August 15, 1980 to September 15, 1980, during which time the local was engaged in a labor strike at Decker's surface coal mine in Big Horn County, Montana.

The claims were submitted for decision to a deputy of the employment security division of the Montana State Department of Labor and Industry, who determined that the claimants were not eligible for such benefits because of a stoppage of work during the strike. The adverse decision of the deputy was appealed by claimants to an appeals referee who after hearing, made a written decision denying the

- 2 -

claimants any unemployment insurance benefits, and finding that a work stoppage existed during the period of the strike.

The claimants appealed the decision of the appeals referee to the Board of Labor Appeals. The Board reversed the decision of the appeals referee, holding that the claimants were entitled to receive unemployment compensation benefits in accordance with their claims, if otherwise qualified.

Decker appealed the Board's decision to the District Court. There the Board was reversed and the decision of the appeals referee was reinstated. A final order was entered by the District Court accordingly, and this appeal ensued.

## I.   DOES MAPA APPLY TO CLAIMS FOR UNEMPLOYMENT INSURANCE BENEFITS?

In this case, the District Court applied the provisions of MAPA, particularly section 2-4-621, MCA, instead of applying the unemployment insurance law. In reversing the holding of the Board of Labor Appeals, the District Court stated in this case:

> "The Board of Labor Appeals is held to the same standard of review of a fact finder's decision as is this Court. The Board cannot substitute its judgment as to the weight of the evidence on questions of fact for that of the appeals referee. The Board may reverse or modify the decision of the appeals referee only if substantial rights of a party have been prejudiced because administrative findings are 'clearly erroneous in view of the reliable, probative and substantial evidence on the whole record' or is 'affected by other error of law.' . . . The decision of the Board of Labor Appeals exceeded its scope of jurisdictional authority by substituting its judgment of the facts and the weight of the evidence for that of the appeals referee."

Thus the District Court determined, and Decker here contends that the Board of Labor Appeals could not reject or modify the findings of fact of the appeals referee unless the

- 3 -

Board first determined from a review of the complete record that the findings of fact of the appeals referee were not based upon competent, substantial evidence or that the proceedings on which the findings were based did not comply with essential requirements of law.

With respect to this issue, this case parallels another case recently before this Court, cause no. 82-106, City of Billings v. State of Montana Board of Labor Appeals, Montana State Department of Labor and Industry, and 325 Members of Local No. 190, Teamsters Union (Decided May 10, 1983), ____ P.2d ____, 40 St.Rep. 648. In that case we examined the provisions of MAPA, and of the unemployment insurance law. We refer the reader to that case for our rather complete discussion of the applicability of each set of statutes to the determination of disputed claims for unemployment insurance benefits. It is enough to say here, for the convenience of the reader, that in City of Billings, supra, we determined:

1. There is contained within the unemployment compensation insurance law itself, without regard to MAPA, a complete procedure for hearing and determining undisputed claims for unemployment insurance benefits, beginning with the deputy of the employment security division, and ending with the Montana Supreme Court. Sections 39-51-2401 through 39-51-2410, MCA.

2. The Board of Labor Appeals, as a quasi-judicial board (section 2-15-1704, MCA) exercises the functions of a quasi-judicial board as outlined in section 2-15-102(9), MCA. As such the Board of Labor Appeals may consider not only the record made before the appeals referee but new evidence produced at the Board hearing.

3. The provisions of MAPA are unworkable when an attempt is made to apply them to determine claims for unemployment insurance benefits. It is an incorrect interpretation of statutory law to hold that the Board has no power to overturn the fact-findings of the appeals referee.

4. The District Court, in reviewing of a decision of the Board of Labor Appeals, is limited by the provisions of section 39-51-2410(5), MCA, which provides:

> "In any judicial proceeding under 39-51-2406 through 39-51-2410, the findings of the board as to facts, if supported by evidence and in the absence of fraud shall be conclusive and the jurisdiction of said court shall be confined to questions of law . . ."

We reiterate the foregoing interpretations of statutory law contained in City of Billings, supra, as applied to this case. It was error for the District Court to limit the power and authority of the Board of Labor Appeals by applying MAPA provisions against it. The powers and duties of the Board of Labor Appeals are to be found in the unemployment insurance law, and in the provisions of law granting it authority to act as a quasi-judicial board.

II.

DID A STOPPAGE OF WORK OCCUR WHICH DISQUALIFIED CLAIMANTS?

Again we determine, as we did in City of Billings, supra, that the appeal by the claimants to this Court in this case squarely places upon us the duty to determine if the findings of the Board of Labor Appeals are supported by evidence as set forth in section 39-51-2410(5), MCA, and if so, whether the Board properly applied the law to those facts. We so hold because it is the intent of the unemployment insurance law that claims for benefits be given accelerated judicial attention (section 39-51-2410(5), MCA)

- 5 -

and further because the District Court in this case has already concluded that the decision of the appeals referee (not the Board) was not clearly erroneous and is supported by reliable, probative and substantial evidence on the whole record; and further that the Board of Labor Appeals' decision is erroneous because it is not based upon reliable probative and substantive evidence on the whole record. In those circumstances, the appeal by the claimants to this Court makes it imperative for us to determine if the findings of the Board are supported by evidence and whether the law was properly applied to the facts.

If the findings of the Board are supported by evidence, in the absence of fraud, such findings are conclusive, and the jurisdiction of the District Court and, on appeal, this Court, is confined to questions of law. Section 39-51-2410(5), MCA.

At oral argument in this case, a discussion arose as to the kind of evidence which would be deemed supportive of the findings of the Board. We conclude from the regulations of the Board that there must be "substantial evidence". Section 24.7.301(c)(vii), A.R.M. "Substantial evidence" has been defined by this Court:

> "We have recently stated substantial evidence is evidence such as will convince reasonable men and about which reasonable men will agree supports the case of the prevailing party. (Citing cases.) Furthermore, the evidence may be inherently weak and still be deemed substantial, and substantial evidence may conflict with other evidence presented. (Citing cases) . . ." Matter of the Estate of Holm (1979), ____ Mont. ___, 588 P.2d 531, 534.

By way of preface, Decker Coal Company had two primary customers for its coal from this mine, Commonwealth Edison and Detroit Edison. The coal contracts of Decker are

- 6 -

commitments to these utilities, but it is the utilities that determine how much coal is needed by them. Management testified before the appeals referee "[i]f the utilities are not taking coal, it slows our production down. That's why it is not indicative month to month." In the year of the strike, Decker was several million tons under its commitment to the utilities, simply because the utilities were not taking coal.

We turn now to the essential facts found by the Board of Labor Appeals to determine if they are supported by substantial evidence in the record. Then it would remain to us to determine if the Board properly found that there was not a "stoppage of work" as that term is used in the unemployment insurance law.

The applicable statute is section 39-51-2305(1), MCA:

> "Effective April 1, 1977, an individual shall be disqualified for benefits for any week with respect to which the department finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed . . ."

The Board found that during the strike "the employer continued to supply the needs of its customers in furnishing coal, it being the business of the employer to mine and deliver coal to customers." This finding is substantiated in full by the testimony of management witness Crilley that customers' needs were supplied during the strike.

The Board found that "there is no other substantial evidence, excluding argument, which would indicate anything other than the fact that the employer in this was able to fully supply the needs of its customers during that period." Again that is fully substantiated by the testimony of the management witness Crilley.

The Board found "a deliberate effort was made and accomplished to stockpile coal in preparation for the strike so that the functions of the employer would not be interrupted insofar as delivering coal to its customers is concerned." This was substantiated by the labor witnesses, and by the management witness Crilley, who testified that before the strike, the "stockpile was larger than normal."

The Board found by "the testimony of Mr. Crilley, the only officer to testify on behalf of the company, that the amount of coal that was removed or delivered from the mine or mining area from the standpoint of number of trains is not indicative of whether or not the strike was having any effect on the operations of the employer and specifically that sworn testimony by Mr. Crilley appears on page 49 of the transcript, lines 1-3, and on page 59 of the transcript, lines 27-29." We have quoted some of that testimony above, and the citations to the transcript bear out the findings of the Board.

The Board concluded "therefore any finding as to the percentage of the number of trains in the strike was not in any way supportive of any conclusion as to whether or not there was a substantial reduction in the functioning of the employers mining operation." This is a conclusion of fact and law which the Board as a quasi-judicial board may draw.

The Board found "the greater weight of the evidence further establishes that during the testimony of the representatives of the employer, that during the period of the strike, they were able to maintain the necessary everyday maintenance upon the equipment." On this point, the testimony of the management witness was:

"Chilton: Were there any breakdowns in equipment?
Crilley: Oh yes.

"Chilton: Were they major? Crilley: One of them
was, yes.

"Chilton: What did that entail? Crilley: Just
everybody they could find went and got together and
fixed it and put in long hours to get it done.

"Chilton: How long was the plant shut down?
Crilley: I can't recall. I couldn't recall,
probably, I don't know. Maybe it was . . .

"Chilton: A matter of hours or days? Crilley:
Hours.

"Chilton: Hours? Crilley: Probably close to a
day, I suppose."

The Board then found "the evidence does establish that
there was some reduction in the amount of preventive
maintenance, however, there is no indication that the
reduction in the amount of preventive maintenance in anyway
interfered with the continual operation of the mine and
delivery of coal." On this finding, the Board is half right.
There was no preventative maintenance done according to the
testimony of Crilley. However, it is true that there is no
showing in the testimony that the reduction in the amount of
preventative maintenance interfered with the operation of the
mine.

The Board further found "the evidence establishes that
there was no backlog of orders, no accumulation of work to be
done following the strike." On this point, the question by
the appeals referee was whether there was a backlog of coal
orders after the strike, and Crilley could not give him that
information.

The Board then found that "the evidence establishes
without dispute that shortly after the strike terminated, the
work force at the mine was reduced by approximately 64 men
(20 or more being maintenance men) and supports the

- 9 -

conclusion of fact that both the employer and the claimants conceded that there was an overstaffing of the mine prior to the time that a strike took place." That evidence came from the unsworn testimony of Crilley, who at the Board hearing informed the Board that 22 of the 64 people laid off were maintenance people. The finding bears on the contention of the appeals referee that the "72 people who remained on duty during the strike could not have performed the work of the 441 union members who were on strike."

The Board further found "the evidence also establishes that although there was somewhere in excess of 400 employees of the mining operation in the bargaining unit, a number of the operations of the mine were run upon a rotating four-shift basis. Although there may be all of them working for some period of time during any weeks of operation, the number of hours that any one man was working would vary anywhere from one shift to several shifts and that on the average there was always one shift that was not working where there was a four-shift rotation basis, and in addition to that, prior to the time when the strike took place, the mine was on a reduced schedule and those men who were working were working in the area of 32 to 36 hours per week." There can be no dispute about this finding of fact. All through the record there are notations to the effect that the men worked from one to four days per week because they were on rotating crews and the mine was operating on reduced schedules allowing the workers to get 32 to 36 hours per week. As we have indicated, in the year of the strike, Decker was several million tons under their commitment because the utilities were not taking coal.

Then the Board found "during the period of the strike, the evidence establishes that there were 72 first line supervisor personnel working in connection with the operation of the mine, and in addition thereto, there were at least 6 persons of administrative personnel who were not first line supervisors who were working in connection with the operation of the mine. Taking into account the first line supervisors and other administrative personnel, the evidence establishes that there was a total of approximately 120 administrative and supervisory personnel working during the course of the strike." Again this figure comes from the unsworn testimony at the Board hearing in a colloquy between the attorney for the employer and the chairman of the board. It follows:

> "Houston: Okay now, if you look at the figures which I think I worked up in the reply brief before Mr. Chilton. We assumed 72 supervisors and the 72 supervisors I think first appears in the transcript by Mr. Rinker. Where he gets that figure, I don't know, and then throughout the transcript, the 72 is continually referred to. Perhaps the correct number of supervisors is 62 and there is an additional 6 or however many. Maybe it was 72, but I think the number of people, supervisors, overhead-type people, salaried personnel-actually working during the strike is probably someplace around 72 working on production needs.
>
> "Whalen: Now wait a minute. It was Mr. Crilley that shuffled it up to 120 during his testimony.
>
> "Houston: 120 reflects everyone out there: secretaries, clerks.
>
> "Whalen: He referred to_____.
>
> "Houston: The whole gamut.
>
> "Whalen: 72 supervisors, first line supervisors, and 120 altogether in my record. That's Mr. Crilley's testimony.
>
> "Houston: Right . . ." Board Hearing Tr. at 14-15.

The Board next found "as to those people working upon the production, the evidence establishes without dispute that

during the first few days of the strike, some of them were working as much as 24 hours a day without stopping and after the strike was in progress, it was developed into a schedule where they were working 12 hours shifts, 7 days per week in operating the mine with administrative and supervisory personnel." There are many references to these facts in the transcript and they cannot be disputed.

Following this, the Board found "the evidence further establishes without dispute that during the course of the strike, there was a complete shutdown by sabotage which, attributable to person or persons other than the claimants in this case, reduced the production and the ability of the mine to function, however, it was not anything that came about by reason of a stoppage of work arising from the strike." This is an important finding by the Board because the appeals referee failed to take it into account in making his findings. One of Decker's former employees shot out a transformer which cut off power to the Decker mine and closed it down for 3 days during the first week of the strike. Crilley testified:

> "Crilley: . . . Right, shortly after the strike started, we had the power line shot out by a former employee and it shut the mine down approximately 3 days and at that time we really picked up security operations, and we drew several people from the out of town office which was supporting that too, Decker Coal, and they performed in a security fashion.

> "Houston: Now you say that he was a former employee? How was he? Was he terminated?

> "Crilley: Oh, at that time he was still in limbo. The man, we'd laid the man off in April and he filed a grievance against us for the methodology of the layoff and that was in arbitration at the time. We have not reached the decision even, we already had an arbitration, but we were awaiting for an opinion of the arbitrator."

It is quite evident that the person who committed the act of sabotage was not one of the claimants and it was not a union-encouraged act.

The Board also found "the evidence before this Board and analysis of the figures furnished by the employer and submitted to the Board for the first time during the Board hearing insofar as inventory is concerned establishes that there was not a reduction in excess of the amount of 7 percent of the inventory based upon the period and figures furnished by the employer." We will take this point up later in discussing the appeals referee's finding on this subject. It is enough to say that there was a reduction in inventory during the strike from pre-strike levels of 5.47 percent and that in the period of 9 weeks following the strike, Decker's coal inventory decreased from the average during the strike by 10.08 percent.

Next the Board found "the evidence further establishes that there was a reduction in production in the amount of approximately 9 percent." We find this could be true depending upon what week one selected prior to the strike or after the strike. On an average basis, it appears that production during the strike was 23.54 percent less than the pre-strike 9 weeks, and 21.3 percent less than the post-strike 9 weeks. Again we will discuss these figures later with respect to whether a stoppage of work occurred here.

The next finding of the Board relates to whether or not there was stripping of overburden. Management testified there was not. Labor witnesses testified that they could see blasting and smoke arising from the overburden which must have been used for the raising of overburden, and that when

- 13 -

they went back to work there was less powder in the powder bins which substantiated their claim that powder had been used. We do not regard this finding as having any significance on mine production for the purposes of this case, however.

The last finding of the Board is that at the termination of the strike, the stockpile which had been prepared in anticipation of the strike had not been used up at the termination of the strike. This is substantiated by the inventory of the coal company at the termination of the strike which showed 195,500 tons of coal on hand.

As we have indicated in the foregoing, the findings of the Board are substantiated on the whole record, using the standard of substantial evidence.

We turn now to the findings of the appeals referee, which the Board of Labor Appeals refused to accept, but which the District Court found were supported by "reliable, probative and substantial evidence on the whole record." The District Court went no further than to state the foregoing conclusion.

The essential facts found by the appeals referee on which he determined there was a stoppage of work, are contained in the following paragraph:

"In an 18-week period, 9 weeks before and 9 weeks after, the employer loaded and shipped an average of 22.8 trains per week. In the strike period, the average was 17 trains per week, a reduction of 25.4 percent. In the same 18-week period, an average of 235,373 tons of coal were mined per week but in the strike period, an average of 142,085 tons of coal were mined per week, a reduction of 37.5 percent. In the week before the strike commenced, the inventories, silos and stockpiles, contained 326,459 tons of coal. In the last week of the strike the inventory was 195,569 tons, a 40.1 percent reduction."

- 14 -

During oral argument, counsel for Decker Coal Company contended that the Board of Labor Appeals did not hear the witnesses and see their demeanor and that because thereof the Board should be bound by the findings of the appeals referee. That contention belies what happened in this case. The appeals referee, after the hearing which he conducted, asked for post-hearing exhibits to be supplied by the employer as to the number of trains shipped by Decker pre-strike, during the strike, and post-strike, the number of tons of coal mined for those same periods, and the inventory of the company for the same periods. Following the strike, the employer submitted figures on those items, none of which are sworn to, and upon which there was no cross-examination, and for which the underlying documents were not supplied. Yet all of the conclusions of the appeals referee which we have quoted foregoing are based upon those unsworn figures with no supporting testimony. In such a case, we are "free to make our own examination of the entire case and to make a determination in accordance with what we find." Kostbade v. Metier (1967), 150 Mont. 139, 141, 432 P.2d 382; Estate of Jensen (1969), 152 Mont. 495, 500, 452 P.2d 418.

It is true that at the Board hearing, there were no witnesses sworn to testify. However, the Board obviously took into consideration statements made by Houston, the company attorney, Crilley, the company personnel manager, Loring, the labor attorney, and some labor witnesses. There is nothing in the Board regulations which require witnesses before it to be sworn. The whole proceeding before the Board is apparently quite informal.

What all this means is that this Court is in as good position as any party to examine the figures from the

- 15 -

exhibits and to determine for ourselves the effect of the strike. We display some of those figures hereunder. We have, however, disregarded the first week of the strike because the mine was shut down during that week for three days due to the act of sabotage which we have referred to. In effect we assume that the production during the first week, if the act of sabotage had not occurred, would average out with the remaining weeks of the strike.

INVENTORY

The appeals referee found that the inventory had been reduced as a result of the strike by 40.1 percent. The Board of Labor Appeals found that figure to be 7 percent. The appeals referee arrived at his percentage figure by taking the last inventory week before the strike and comparing it with the first inventory week after the strike had ended. We think a fairer way of determining the facts relating to the inventory would involve a comparison of the 9 weeks pre-strike with the 9 weeks following the strike to determine their usual averages. Decker argues for this approach in its brief stating: "The only fair way to compute usual production is to balance good weeks with bad weeks. All the evidence was before the appeals referee and the Board, and both the good and the bad must be averaged together."

The pre-strike tonnage of coal in stockpiles and silos on hand for the 9 weeks preceding the strikes follows:

```
        207,915
        218,539
        246,996
        214,105
        197,773
        139,719
        252,196
        312,466
        326,459
      2,116,168 tons
```

The average number of tons on hand for the weeks preceding the strike is 235,129.78 tons. This figure includes the stockpiling that was done prior to the strike and in anticipation of the strike.

During the four weeks of the strike, the inventory of the coal on hand is represented by the following figures:

```
231,519
252,749
209,192
195,569
889,029 tons
```

Therefore, the average number of tons on hand during the strike was 222,257.25 tons.

These figures indicate the average number of tons on hand during the strike was only 12,872.53 tons less than the average number of tons on hand for the 9 weeks prior to the strike including stockpiling. The 12,872.53 tons represents a decrease from the pre-strike average of 5.47 percent.

In the 9 weeks following the strike, the post-strike inventory of coal is represented by the following figures:

```
254,771
221,067
212,085
244,967
139,049
141,393
186,594
215,916
182,803
1,798,645 tons
```

The average of those figures is 199,849.44 tons. In other words, the company had on hand as coal inventory following the strike, a lesser number of tons than it had during the strike. The amount of decrease from the average tons of coal on hand during the strike is 10.08 percent. In fact, in the 9 weeks succeeding the strike, Decker kept on the average 15 percent less coal on hand than it had

stockpiled or possessed in silos in the 9 weeks preceding the strike.

In the face of these figures, little validity can be attached to the findings of the appeals referee that inventory had been reduced 40.1 percent. That figure is meaningless.

TRAINS SHIPPED OUT

The figures for the number of trains of coal shipped out from Decker for the 9 weeks preceding the strike are:

```
     13
     13
     17
     25
     32
     37
     21
     19
     20
    197  trains
```

The average shipment per week was 21.9 trains.

The number of trains shipped for the 3 good weeks of the strike are:

```
     15
     20
     18
     53  trains
```

The average number of trains shipped out during the strike is 17.67.

The difference between 21.9 and 17.67 is 4.23. This difference is a 19.3 percent reduction between trains shipped out during the strike and those shipped out pre-strike. The appeals referee found 25.4 percent.

Looking at the trains shipped out post-strike, those figures are as follows:

```
       16
       24
       18
       17
       24
       23
       23
       26
       21
      192  trains
```

The average of the 9 weeks post-strike was 21.33 trains. This represents an increase of 3.66 trains per week over the strike average of 17.67 trains. This means a 20.7 percent increase in the number of trains shipped out after the strike. Again this is lower than the 25.4 percent found by the appeals referee.

In connection with trains shipped out, we note a factor not for its argumentative force but to let the parties know that we have not overlooked it. The Decker Coal Company mine apparently has a "sister mine" operated by the Big Horn Coal Company. Decker Coal Company is a joint venture. Wytana, Inc., a subsidiary of Peter Kiewit Sons, Inc. is one of the joint venturers and Western Minerals, Inc., an Oregon corporation, which may be a subsidiary of Pacific Power and Light is the other. Big Horn Coal Company is a subsidiary of Peter Kiewit Sons, Inc. The managing or operating partner of the Decker Coal mine is a subsidiary of the same holding company as Big Horn Coal Company. It is to that extent, argued Decker's lawyer at the Board hearing, that the two are "sister companies." They have some of the same customers. Decker submitted among its post-hearing figures to the appeals referee a record of trains shipped out by Big Horn Coal Company. These figures indicate an increase in trains

shipped out by Big Horn Coal Company during the period Decker was subject to the strike. The inference to be drawn is that Decker's commitments for coal were being met by Big Horn Coal Company.

We disregard, however, the references to Big Horn Coal Company because the appeals referee made no findings with respect to that subject. The Board of Labor Appeals gave it no significance in its consideration. Nothing in the evidence or testimony connects Big Horn Coal Company with Decker's production and operation other than the random statements made by the attorney at the Board hearing and the post-hearing figures submitted. The Big Horn Coal Company figures are unsubstantiated, unconnected, and so are irrelevant to our discussion here.

TONS MINED FROM THE PIT

The appeals referee found that in the 18 week period before strike and after strike, Decker mined an average of 235,373 tons of coal per week and that during the strike it mined an average of only 142,085 tons of coal per week, a reduction of 37.5 percent.

Again, the figures used by the appeals referee are skewed. The intensive stockpiling undertaken by Decker before the strike resulted in a mine production in excess of 300,000 tons in three of the nine weeks before the strike occurred. In the nine weeks following the strike, there was only one week in November when the coal production from Decker exceeded 300,000 tons in a week. The appeals referee also included the week when the mine was down for three days as a result of the power outage induced by sabotage, when production was only 62,693 tons in the week. The use of such figures does not fairly represent the loss of mine tonnage

that occurred during the strike. If the one week of the strike is omitted, and all weeks exceeding 300,000 tons, the resulting decrease in mine production from the viewpoint of tons mined is no more than 23.54 percent.

RELEVANCE OF FIGURES

What we have attempted to demonstrate by the foregoing discussion is that the appeals referee was playing with numbers when he made the findings upon which Decker claims the District Court should be affirmed. We have played with the numbers ourselves to demonstrate that depending upon the methodology, argument can be made to substantiate several positions favorable or not favorable to the claimants in this case. There is no testimonial basis in the record, since the figures were submitted post-trial and without underlying documents or other proof which gives any degree of certitude in relevance to the figures submitted, and how they should be used. In effect there has been a failure of proof, because the figures used by the referee and his calculations therefrom are demonstrably mathematically and statistically unsound. Worse, this playing with numbers distracts the parties and the court from the real purpose of our determination here, did a "work stoppage" occur within the meaning of the unemployment insurance law.

As we noted in the recent City of Billings case, supra, Montana has aligned itself with those courts holding on the question that the phrase "stoppage of work" refers to employer's operations rather than to the individual employee's work, and that strikers may collect benefits under the "American rule" so long as their activities have not substantially curtailed the productive operations of their employer. The record clearly supports the Board of Labor

Appeals in its finding that here the business of the employer was to mine and deliver coal to customers and that there is no substantial showing of unfulfilled customer demands nor any curtailment in its deliveries of coal to its two principal customers. This means that a "stoppage of work" as that term is contemplated in the present unemployment insurance law, had not occurred in this case. By that fact, the claims of the claimants for benefits may not be denied.

Again we point out, as we did in City of Billings, supra, that the wisdom or even the fairness of the economic legislation we are considering here is not before us nor do we pass upon its merits. Determination of state economic policy is for the legislature. It is in the arena of the legislature where labor and management can face off that state economic policy in this matter can be decided.

III.

Accordingly, the judgment of the District Court is reversed and the order of the Board of Labor Appeals is reinstated.

_____
                  Justice

We Concur:

_____
        Chief Justice

_____

_____

_____

_____
Justices

Mr. Chief Justice Frank I. Haswell, Justice L. C. Gulbrandson and Justice Fred J. Weber will file separate opinions later.

-22-

DISSENT

No. 82-359

DECKER COAL COMPANY v. ESD


Mr. Chief Justice Frank I. Haswell, Mr. Justice L. C. Gulbrandson and Mr. Justice Fred J. Weber, dissenting.

We would remand the case to the District Court for judicial review under the correct standard of review in the Unemployment Compensation Act.

Our view in this case on the correct standard of review and the respective functions of the Board of Labor Appeals and the District Court are set forth in our dissent in Cause No. 82-106, City of Billings v. State of Montana Board of Labor Appeals et al., 40 St.Rep. 648.

_____
Chief Justice

_____

_____
Justice

FILED

SEP 20 1983

Ethel M. Harrison
CLERK OF SUPREME COURT
STATE OF MONTANA

1