MR. JUSTICE SHEEHY,
dissenting:
Let us first be clear about what this case involves. This decision does not mean the discharged air controllers will not receive unemployment benefits. They have already received them, and we all recognize the impossibility of recov *8 ering the benefits from the individual air controllers.
What the majority has done is agree that the already hard-pressed state unemployment insurance fund will reimburse the FAA for the cost of the benefits. Thus will the FAA escape fiscal responsibility for the ills which the federal government brought down on all of us by its refusal to correct the intolerable working conditions to which it had subjected and does now subject the controllers at our airports. We ought to put the responsibility for the payment, not on the employers of this state, but on the feds who indeed were more interested in breaking labor than protecting our air safety.
In the six years I have served the Court, I have been accorded the opportunity to write some far-reaching decisions, and to disagree with others equally far-reaching. In most of them, however, I saw where the Court could pride itself as a fair arbiter in deciding between the individual and the sometimes overwhelming use of power by officials, better termed by Hamlet as “the insolence of office”. Today I am not proud. My Court has called workers guilty of misconduct for obeying the call of their national union to strike. My stomach turns at this. Helpless in the power struggle, the air controllers chose to support each other in their cry for better working conditions. Misconduct? We should rather admire the courage it took to give up their jobs and benefits rather than bend their necks to their would-be masters.
I do not exaggerate the abusive working conditions that led the controllers to their choice. In the Wall Street Journal of July 5, 1984, on page 10, there is quoted in part a letter to the FAA’s administrator from the chairman of Pan American Airlines which states:
“The air traffic controller problem has gone from bad — to worse — to horrible — to intolerable. [Pan Am is] now experiencing more frequent and more substantial delays in clear, optimum conditions than we were incurring during severe conditions a few months ago.”
*9 In the Billings Gazette, Tuesday, July 10, 1984, page 7B, one finds the Associated Press story concerning the increase in the number of flight delays in and out of major airports which causes scheduling and arrival troubles for the airlines. The airlines blame the Federal Aviation Administration for the over-burdened air traffic control system. The FAA, which cannot now blame the new air controllers it brought into position, blames the airlines. Here is a paragraph, three years after the strike, to dampen your soaring spirit:
“The government’s air traffic control system is still recovering from the strike three years ago when 11,400 controllers were fired. The FAA is 1,000 controllers short of what it considers full strength, and many of the current controllers are inexperienced.”
We ought to place misconduct where it properly should lie, on the administration that brought this alarming condition about. We ought to recognize that the air controllers had the right in 1981 to the same principle that we applaud in the Declaration of Independence, that “when a long train of abuses and usurpations, pursuing invariably the same object, evinces a design to reduce them under absolute despotism, it is their right, it is their duty, to throw off such government and to provide new guards for their future security.”
We should not succumb, as most of government has, to government by Gallup Poll.
The statute on misconduct, Section 39-51-2303, MCA, was never intended by the legislature to apply to unemployment caused by labor dispute. Misconduct in the sense of that statute refers to individual fraud, theft, vandalism, and other acts which bring about a firing because of those acts against the employer. The only statute we have applicable to a labor dispute is Section 39-5-1-2305(1), MCA. In City of Billings v. State Board of Labor Appeals (Mont. 1983), [204 Mont. 38,] 663 P.2d 1167, 1174, 40 St. Rep. 648, 655, we said concerning the labor disputes statute:
*10 “In examining the statute, note that the inclusion of the phrase ‘stoppage of work’ by the legislature is not intended to be a synonym for ‘strike’ or ‘lockout’. If the legislature meant that a striking or locked out employee would be disqualified for benefits, it had to only eliminate the phrase ‘stoppage of work’ so as to make the Section read that the individual is disqualified for benefits if his total unemployment is ‘because of a labor dispute at the factory.’ When the legislature inserted the words ‘due to a stoppage of work,’ it meant that the factor to be considered in connection with disqualification meant more than that the individual claimant was on strike, or locked out in a labor dispute. There may be a labor dispute and yet no stoppage of work.
“Montana has aligned itself with the majority of courts holding on the question that the phrase ‘stoppage of work’ refers to the employers’ operations rather than to the individual employee’s work, (citing authority) This so called ‘American rule’ allows strikers to collect benefits so long as their activities have not substantially curtailed the productive operations of their employer, (citing authority)”
City of Billings, supra, and other cases (Continental Oil Company v. Board of Labor Appeals (1978), 178 Mont. 143, 582 P.2d 1236; Decker Coal v. Employment Security Division of Montana (Mont. 1983), [205 Mont. 1,] 667 P.2d 1929, [40 St.Rep. 1056,]) have indicated our interpretation of the unemployment compensation benefits statutes as to leave the matter of labor disputes to the legislature and to the parties, and to determine the rights of workers to unemployment insurance benefits solely upon the provisions of Section 39-51-2305(1) when a labor dispute is involved. The majority without discussion has departed from that position.
I would affirm the Board of Labor Appeals that no stoppage of work had occurred and that the air controllers were entitled to the benefits which they received. The effect would be to tell the FAA that it and not Montana employers must bear the burden of its intransigence.
*11 MR. JUSTICE MORRISON, dissenting:
I concur in the dissent of Mr. Justice Sheehy.
MR. JUSTICE SHEA, dissenting:
I join in the dissent of Mr. Justice Sheehy.